Jerry W. **VOLKMAN**, et al., Plaintiffs,

v.

**UNITED TRANSPORTATION UNION,**
et al., Defendants.

Civ. A. No. 83–6025–FGT.

United States District Court,
D. Kansas.

June 18, 1993.

1254

Lee H. Woodard, Woodard, Blaylock, Hernandez, Pilgreen & Roth, David H.M. Gray, Hiebsch, Gragert, Hiebert, Gray & Davisson, Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, Bruce H. Stoltze, Brick, Seckington, Bowers, Swartz and Gentry, Des Moines, IA, for plaintiffs.

Randall H. Elam, Ratner, Mattox, Ratner, Brimer & Elam, P.A., Wichita, KS, Pamela D. Walker, Little Rock, AR, Norton N. Newborn, Norton N. Newborn Co., L.P.A., Cleveland, OH, for United Transp. Union, Fred A. Hardin and R.H. Arnett.

Mark L. Bennett, Jr., Bennett & Dillon, Topeka, KS, Robert S. Bogason, Southern Pacific Transp. Co., San Francisco, CA, for St. Louis Southwestern Ry. Co., South Pacific Co. and Southern Pacific Transp. Co.

Bruce H. Stoltze, Brick, Seckington, Bowers, Swartz & Gentry, Des Moines, IA, for Roger L. Moore, Franklin A. Callaway and Richard L. Humble.

### MEMORANDUM AND ORDER

THEIS, District Judge.

Several matters are presently pending before the court, the resolution of which should clear the way for the entry of final judgment. The court held a hearing on April 22, 1993 for the purpose of hearing evidence on the backpay claims of three of the plaintiff class members. The other pending issues were presented on the briefs filed prior to the hearing. The court has received the parties' post-hearing briefs and is prepared to rule.

### I. Motion to Intervene

Plaintiff class members Roger L. Moore, Franklin A. Callaway and Richard L. Humble (represented by separate counsel Bruce Stoltze) have moved to intervene in this case as class representatives and for the creation of a subclass. Doc. 446, refiled as Doc. 448. Subsequent to the court's ruling in September 1989 which denied relief to certain class members, Bruce Stoltze entered his appearance as independent counsel for eight (8) class members who have been called the "off-line" Rock Island trainmen. In their present motions, they state that the correct descrip-

tion of their group is "individuals who were former employees of the former Rock Island, but were not employed by the Rock Island as trainmen on the Tucumcari Line which was purchased by the SSW in this matter." These plaintiffs were employees of the Rock Island but were not employed on the Tucumcari Line until after the purchase of that line by SSW. *See* Doc. 449, Memorandum in support of motion to intervene, p. 2, ¶ 4.

These plaintiffs assert that because of the rulings of the court, a conflict has arisen among various class members. The potential subclass representatives Moore, Callaway and Humble seek to intervene and to have a subclass created "in order to allow for the creation of a group who will be able to process an appeal independently ..." Doc. 448, p. 2.

The defendants filed a combined response, Doc. 455. Defendants argue that the proposed subclass is not properly defined. Defendants argue that if the proposed subclass is defined as in the movants' brief, the subclass would be so broad that it would not fit within the class as originally defined. Defendants also argue that the proposed subclass does not meet all the requirements of Rule 23 of the Federal Rules of Civil Procedure. Defendants assert that the proposed class is not so numerous that joinder is impracticable. Eight members of the plaintiff class have retained separate counsel. Defendants assert that if all the off-line employees were considered, there would only be a total of eleven members of the subclass. *See* RR. Trial Exh. 161.

The defendants next argue that creation of a subclass is inappropriate since there is no conflict of interest between named plaintiffs and movants. Movants argue that since some of the class obtained relief and movants did not, there is a conflict of interest. Defendants note that the named plaintiffs also did not obtain relief. The named plaintiffs have an interest in the pursuit of appeal and in representing all the class members who did not recover under this court's rulings.

■ As counsel for movants stated at the hearing, these plaintiffs seek to appeal to the Tenth Circuit. This court does not believe that intervention is the appropriate proce-

dural device. Nor does intervention appear to be necessary, since the movants are already parties to this action. The motion to intervene shall be denied. However, to preserve their appeal rights and to avoid any confusion regarding class representation, movants are granted leave to pursue an independent appeal through their counsel of record Bruce Stoltze.

## II. Backpay Claims of Eldon Employees

■ The court conducted an evidentiary hearing regarding the backpay claims of Eldon employees R.D. Miller, C.D. Crane and D.W. Frank. These three plaintiffs possess prior rights at the terminal at Eldon, Missouri. They were offered the opportunity to transfer their prior rights to Jefferson City, Missouri in March 1992 pursuant to the court's injunction. All three declined to do so. All three testified that they would have accepted a prior rights position at Jefferson City had one been offered in 1983, but that subsequent events have made their Eldon prior rights positions appear to be more valuable.

R.D. Miller was the Eldon local chairman of the UTU. He testified at the liability trial regarding his participation in the negotiations for the implementing agreement. Miller's goal was to ensure that the Eldon employees obtained prior rights on whatever line over which SSW received trackage rights. During the implementing agreement negotiations in the early 1980s, the parties believed that SSW would obtain trackage rights on the Missouri Pacific line through Jefferson City. Subsequently, SSW did obtain those trackage rights. However, the implementing agreement ultimately concluded by the defendants failed to give employment on the trackage rights to the Eldon employees. *See Volkman v. United Transportation Union,* 724 F.Supp. 1282, 1304–05 (D.Kan.1989).

Miller testified at the evidentiary hearing regarding his work at the Eldon terminal. From March 1983, Miller worked the Owensville to St. Louis local train. Miller worked that regularly through October 1991, when he went to the Eldon extra board. The

guaranteed extra board guaranteed each employee a minimum of 3800 miles ($3503.00) per month. In 1992, the guarantee was changed to $3800.00 per month.

Miller testified that had a position been offered at Jefferson City in 1983, he would have taken it. At that time, the work at the Eldon terminal consisted of only one local train which operated from a point 90 miles away from Eldon. Business was declining and the track was in poor condition. Miller believed he would have earned more at Jefferson City.

In March 1992, Miller declined the option to move to Jefferson City with his prior rights. Miller testified that with the addition of the coal train that began operating in 1990, the guaranteed extra board and the rehabilitated track, the Eldon job was more secure. Miller feared that Jefferson City was not going to be retained as an SSW terminal.

C.D. Crane testified at the evidentiary hearing that if SSW had offered him a job at Jefferson City in 1983, he would have taken it. Crane testified that a position in Jefferson City in 1983 was a better job, closer to home (Jefferson City is approximately 30 miles from Eldon), with greater job security and higher pay. Crane declined the option to transfer to Jefferson City in 1992 because the Eldon terminal then had the local train, the coal train and the guaranteed extra board. Crane also referred to the rumors that the Jefferson City terminal could be closing.

D.W. Frank also testified regarding his work history since 1983. Frank testified that he would have take a position at Jefferson City had it been offered in 1983. In March 1992, Frank declined the prior rights position at Jefferson City. Frank testified that he had job security at Eldon, with the coal train, the local, and the guaranteed extra board. If he had transferred to Jefferson City in 1992, he would have lost his Eldon prior rights. Eldon was preferable because the jobs were good, the track was rehabilitated, and Eldon was his home.

Plaintiff class member G.R. Vernon testified regarding his earnings at Jefferson City from 1984 through 1988.

Defendants presented testimony from two Southern Pacific employees, Robert Huff and Cindy Biggs. Huff testified regarding the work at Eldon and Jefferson City. Biggs testified that Miller and Frank voluntarily chose to remain on the extra board.

The primary question presented by the defendants is whether the Eldon prior rights employees Miller, Crane and Frank are entitled to back pay. In the court's July 24, 1991 memorandum and order, the court stated that the three Eldon employees shall be granted back pay "in the event their wages from working the Eldon local were less than the wages of the three ... most senior brakemen in Jefferson City." Doc. 330, at p. 21. The court has previously ruled that the Eldon employees were to be granted back pay. After having heard the testimony at the hearing, the court sees no need to depart from that prior ruling.

Defendant Railroads argue that it would be unfair to award the Eldon employees back wages based on the earnings of the Jefferson City employees because the three Eldon employees never desired to exchange their Eldon prior rights for prior rights at Jefferson City. The Railroads argue that the Eldon claimants have received substantial earnings working good jobs at Eldon. The Railroads argue that the regular hours and shorter work week made the jobs at Eldon more desirable than the positions at Jefferson City, which had higher pay but irregular hours.

Defendant UTU argues that the three claimants prefer now, and preferred in the past, to work the regular local runs off the Eldon roster that guaranteed them an income no matter how little they worked. UTU notes that only Frank ever exercised his seniority to work at Jefferson City. UTU argues that having prior rights at Jefferson City would not have changed the jobs available there. UTU argues that there have never been any regular guaranteed jobs at Jefferson City like the jobs the claimants have held in Eldon. UTU concludes that the three Eldon claimants, as individuals, have

not individually suffered any injury and therefore, cannot claim individual damages.

The court finds itself in agreement with the position taken by plaintiffs. There was a substantial change in circumstances between 1983 and 1992. The relevant time period to consider is the early 1980s. The court must examine the various parties' expectations as of that time frame.

The evidence presented at the liability trial established that the section of the Tucumcari Line between Kansas City and St. Louis (Eldon terminal) was in poor condition. SSW and UTU contemplated that SSW would never use the Tucumcari Line between Kansas City and St. Louis. Rehabilitation of the track would be extremely expensive. SSW threatened to withdraw its application to purchase the Tucumcari Line if it could not obtain trackage rights between Kansas City and St. Louis over another line. SSW eventually obtained trackage rights on the Missouri Pacific (Jefferson City terminal). *See* 724 F.Supp. at 1304.

On several occasions in 1980 and 1981, representatives of SSW and UTU promised that the Eldon employees would have prior rights to jobs between Kansas City and St. Louis on the trackage rights to be obtained by SSW. *See id.* Plaintiff Miller attended negotiating sessions to make sure that the Eldon employees would get the trackage rights jobs. Miller was assured that the Eldon employees would get those jobs. *Id.* at 1304–05. It was understood that the Eldon employees would be entitled to employment when SSW connected the line from Kansas City to St. Louis, regardless of how SSW reached St. Louis. *See id.* at 1305.

During the relevant time frame, the former Rock Island employees from Eldon desired and were promised employment on the trackage rights through Jefferson City. Subsequent events differed from the parties' predictions—the Eldon terminal did not close, parts of the Tucumcari Line between Kansas City and St. Louis were rehabilitated and some trains began to operate. The parties' early 1980s predictions of the course of future events turned out to be in error. That the parties were unsuccessful in predicting the course of future events does not alter the fact that, at the relevant time, Miller, Crane and Frank would have taken positions at Jefferson City. Accordingly, they are entitled to back wages reflecting what they would have earned at Jefferson City had they been employed there.

On the issue of mitigation of damages, the parties are in disagreement as to the appropriate measure of interim earnings to use. The actual interim earnings of the three Eldon men shall be used as the measure of mitigation of damages. *See* Doc. 330, at p. 21 (Eldon employees granted back pay "in the event their wages from working the Eldon local were less than the wages of the three ... most senior brakemen in Jefferson City.").

The parties' briefs presented a factual question regarding the relative seniority of Frank and Crane. Crane testified that he possessed greater Rock Island seniority than Frank. Frank testified that he possessed the least seniority of the three Eldon employees. The court accepts these factual matters as true, in the absence of any evidence to the contrary.

Finally, the journal entry of judgment should specify that Miller, Crane and Frank possess prior rights at Eldon. The court notes here that the 1983 hires who were granted prior rights by the court at Pratt and Dalhart (including R.D. Parker, *see infra* ) are listed in plaintiffs' proposed journal entry. The court sees no reason to omit a listing of the individuals who possess prior rights at Eldon. However, a detailed discussion regarding the rejection of Jefferson City prior rights positions by Miller, Crane and Frank (as proposed by defendants) shall not be included.

### III. Parker and Jones

Plaintiffs R.D. Parker and C.O. Jones have been considered separately from the other plaintiff class members. Parker was terminated when he refused a recall to SSW in 1984. Jones declined an SSW job offer in 1983. The court has previously held that both would have accepted jobs if offered under the provisions of the March 4 agreement. The defendants raise several issues

regarding the back pay claims of Parker and Jones. In ruling on the damage claims of Parker and Jones, the court notes the following general principles.

■ The burden is on the plaintiffs to prove the gross amounts of backpay and related damages due each of them. The burden then shifts to the defendants to demonstrate any reductions in the amount of backpay or any facts which would mitigate their liability. *Lundy Packing Co. v. NLRB,* 856 F.2d 627, 629 (4th Cir.1988); *Kawasaki Motors Mfg. Corp., U.S.A. v. NLRB,* 850 F.2d 524, 527 (9th Cir.1988); *NLRB v. Overseas Motors, Inc.,* 818 F.2d 517, 521 (6th Cir.1987); *NLRB v. Laredo Packing Co.,* 730 F.2d 405, 407 (5th Cir.1984) (per curiam). Back pay liability normally runs until the employer makes a valid, unconditional offer of reinstatement. A claimant who rejects a valid reinstatement offer is not entitled to back pay for the period after the rejection of the offer. *Aguinaga v. United Food and Commercial Workers Int'l Union,* 993 F.2d 1463 (10th Cir.1993).

■ A backpay claimant has a duty to mitigate his damages. A claimant's failure to search for alternative work, his refusal to accept substantially equivalent employment, or his voluntary quitting of alternative employment without good cause constitute affirmative defenses to backpay liability. *NLRB v. Laredo Packing Co.,* 730 F.2d 405, 407 (5th Cir.1984) (per curiam). A claimant is not required, however, to accept anything other than suitable interim employment. *Id.* at 408. The reasonableness of a claimant's efforts to secure substantially equivalent employment is determined by, inter alia, the economic climate and the worker's skill, qualifications, age, and personal limitations. *Lundy Packing Co. v. NLRB,* 856 F.2d 627, 629 (4th Cir.1988). The burden is not placed on the employee to prove a "systematic method of searching for a job." *NLRB v. Westin Hotel,* 758 F.2d 1126, 1130 (6th Cir. 1985).

In *Aguinaga,* the Tenth Circuit recently reiterated the standards governing the mitigation of damages requirement in a hybrid breach of contract/breach of duty of fair representation case:

> Employees claiming entitlement to back pay and benefits are required to make reasonable efforts to mitigate damages. *EEOC v. Sandia Corp.,* 639 F.2d 600, 627 (10th Cir.1980). Once back pay and benefits have been awarded, the burden is on the employer to show that the claimant did not exercise reasonable diligence in mitigating his or her damages. *Id.* to satisfy this burden, the employer must establish that: (1) there were suitable positions which the claimants could have discovered and for which they were qualified, and (2) the claimants failed to use reasonable diligence in seeking such positions. *Id.* (citation omitted).

*Aguinaga v. United Food and Commercial Workers Int'l Union,* 993 F.2d 1463, 1474 (10th Cir.1993). To satisfy this burden, the defendants must satisfy both prongs of the two-part test. *Id.*

### A. Parker

None of the parties has requested an evidentiary hearing on Parker. Consequently, the court shall rule based on the submissions of the parties. It appears that Parker is presently working for SSW with prior rights pursuant to the court's previous orders and the preliminary injunction. Parker's damages should be computed in the same general manner as the other Pratt employees granted prior rights by the court. Parker's damages cease when he was reinstated with prior rights.

Parker's damages do not cease upon his refusal of the recall in 1984. The court has previously ruled that Parker was justified in refusing the recall, since the position was not offered pursuant to the March 4 agreement. The job offer was not a valid offer of reinstatement.

The defendants argue that Parker voluntarily quit his interim employment with the OKT Railroad, without good cause, by taking a buyout in 1989. He was offered a buyout or a transfer to another location. A review of the defendants' submissions indicates that they cannot meet their burden of proof on this issue. As noted above, a back pay claimant may resign interim employment if he has

good cause. There could be any number of reasons why an employee would accept a severance package in lieu of a transfer to a new location. The court can only speculate as to Parker's reasons. Defendants have failed to establish that Parker quit his employment without good cause. Accepting the buyout does not preclude Parker from recovering damages after 1989. However, the buyout payment does reduce his damages as discussed later in this opinion.

The defendants argue that Parker failed to seek work during the periods in which he had no income. It is defendants' burden to prove that Parker failed to exercise reasonable diligence in mitigating his damages. Defendants have failed to establish that there were suitable positions for which Parker was qualified and that he failed to use reasonable diligence in seeking such positions.

The court has previously ruled that the average wage of the off-line plaintiffs should be used as the measure of what could have been earned by the 1983 hires. *See* Doc. 330. Consequently, the greater of the average wage of the off-line former Rock Island employees below Parker on the seniority roster at Pratt or Parker's actual interim earnings is to be used as the measure of what Parker should have earned. Jones' higher earnings will not be imputed to Parker as a measure of what Parker could have earned in the interim. Likewise, the court shall not consider what Parker would have earned from SSW if he had accepted the recall in 1984.

### B.  Jones

Jones is entitled to damages notwithstanding the fact that he refused the SSW's offer of employment in 1983. The court has previously ruled that Jones was justified in refusing the offer, since the position was not offered pursuant to the March 4 agreement. The job offer was not a valid offer of reinstatement.

Defendants argue that Jones is not entitled to recover damages for the period after his buyout from the OKT Railroad in 1989. Jones was also offered a buyout or a transfer to another location. As the court has ruled regarding Parker, Jones is not precluded from recovering damages after he accepted

the buyout. It is the defendants' burden to show that Jones quit without good cause. Defendants have failed to establish a lack of good cause for Jones' acceptance of the buyout instead of a transfer. Accepting the buyout does not preclude Jones from recovering damages after 1989. However, the buyout payment does reduce his damages as discussed later in this opinion.

As noted above, the measure of mitigation of damages is the greater of Jones' actual earnings or the average earnings of the off-line former Rock Island employees below Jones on the seniority roster at Pratt. The court shall not consider the amount Jones would have earned after 1989 had he stayed with the OKT.

Jones is not precluded from recovering damages because he refused an April 1992 offer of a prior rights position. The court has previously held that Jones would have accepted a March 4 job had it been offered in 1983. His refusal of a prior rights position in April 1992 does operate to cut off his damages.

The denial of prior rights (based on Jones' 1992 refusal of the job offer) need not be included in the injunctive relief provision of the judgment. It is not necessary for the journal entry to specify that Jones does not have prior rights. The absence of Jones' name on the listing of parties with prior rights is sufficient to indicate that Jones does not have prior rights. The plaintiffs' proposed journal entry contains language finding in favor of the defendants on all claims and parties not included therein. This language is sufficient to indicate that Jones (along with any other plaintiff class member who did not receive prior rights pursuant to the court's orders) does not have prior rights.

### IV.  Injunctive Relief

All parties appear to be in agreement that the prior rights granted by the court are subject to modification by collective bargaining the same as any other prior rights granted under labor contracts. Plaintiffs propose language that would allow the court to exercise jurisdiction in cases arising from a violation of the court's injunction. SSW's propos-

al would leave all future disputes to grievance and arbitration procedures. The court has concluded that all future disputes regarding prior rights and seniority shall be left to grievance and arbitration.

Plaintiffs propose that the prior rights granted to the 1983 hires are deemed to have the same status as if provided by *an* implementing agreement negotiated under the March 4 agreement. Defendants propose language that the prior rights granted by the court shall be considered to have the same status as if they were provided in the February 23, 1982 implementing agreement and/or the decision of Arbitrator Warshaw. The court agrees with the position taken by the plaintiffs.

Both SSW and UTU propose language stating that the February 23, 1982 implementing agreement and the agreement imposed by the March 9, 1983 decision of Arbitrator Jack Warshaw are valid as modified by the court. Plaintiffs have objected to this language. The court notes that plaintiffs do not argue that the implementing agreement is invalid. Plaintiffs argue that the defendants' proposed language is not justified by the court's rulings. Plaintiffs argue that the court has never specifically addressed whether the implementing agreement and the agreement resulting from the Warshaw arbitration were valid.

In the court's findings of fact and conclusions of law dated September 14, 1989, the court ruled that the implementing agreement violated the March 4 agreement in three particulars. First, the implementing agreement capped the hiring of Rock Island employees at the number for permanent/prior rights positions. This provision precluded the hiring of former Rock Island brakemen until after SSW transferred all willing Pine Bluff Division furloughed employees to the Kansas City Division. Second, the implementing agreement eliminated the preferential hiring for Rock Island brakemen at the terminal where Tucumcari Line traffic would travel in Missouri. This provision eliminated from the Eldon terminal the base level of preferential hiring guaranteed to the other terminals. Third, a violation of the March 4 agreement occurred when SSW transferred

furloughed Pine Bluff Division employees to Pratt in July 1982. *See* 724 F.Supp. at 1328–29.

The court held that UTU violated its duty of fair representation by the exclusion of Rock Island representatives from the implementing agreement negotiations in 1981–1982 and by misleading Rock Island representatives regarding the dates of the next negotiating meeting while secretly concluding the implementing agreement. 724 F.Supp. at 1330. The court found the UTU acted arbitrarily and in bad faith in handling the number of prior rights positions at Eldon terminal in the implementing agreement. *Id.* at 1332. The court also found the UTU breached its duty of fair representation in the negotiations preceding and at the Warshaw arbitration. UTU and SSW manufactured a dispute and, by a series of concessions, created two questions for arbitration that each had only one answer, an answer which favored the Pine Bluff Division employees. *Id.* at 1333.

The court never specifically invalidated the February 23, 1982 implementing agreement nor specifically vacated the Warshaw arbitration award. The court agrees with the plaintiffs' position. The proposed findings on the validity of the implementing agreement and the arbitration award are not necessary to the court's award of injunctive relief.

The parties are in agreement that there should be some prohibition on SSW from conditioning a severance payment (buyout) on the waiver of claims in this action. Plaintiffs propose a blanket prohibition, while SSW suggests allowing counsel for plaintiffs to approve a waiver of claims as a condition of receiving severance benefits. The court believes it appropriate to make this a blanket prohibition.

The court concurs with plaintiffs' proposed language "Defendants SSW and UTU shall continue to recognize the existing prior rights of the pre–1983 hires." The court notes that UTU objects to this language, stating that it has never tried to abrogate those prior rights. Plaintiffs argue that they want to ensure that there is no claim that the February 23, 1982 implementing agreement

has been invalidated by the court and that, therefore, the pre–1983 hires' prior rights are no longer valid. The court rules that the journal entry may contain this language proposed by the plaintiffs. This provision does not imply that any of the defendants has attempted to abrogate the existing prior rights.

The parties agree that the journal entry should provide that the injunctive relief previously ordered shall "continue to be implemented."

Defendants' proposed journal entry specifies in some detail (1) that Jones has no prior rights because of his refusal of the 1992 employment offer; (2) that the Eldon employees have prior rights only at Eldon and not at Jefferson City because they declined the opportunity to transfer their prior rights to Jefferson City in 1992; and (3) that Parker has been offered a prior rights position. The plaintiffs object to the inclusion of these specific items in the final judgment. Plaintiffs' proposed journal entry lists the other individuals who have been granted prior rights by the court, including Parker. The court has ruled above that the Eldon employees with prior rights should be listed in the journal entry. Jones' lack of prior rights need not be specified. Parker's name should be included on the prior rights list, as it is in plaintiffs' proposed journal entry.

## V. Joint and Several Liability

Plaintiffs and SSW propose that SSW and UTU be held jointly and severally liable for all money damages, with SPT liable only if SSW cannot pay. UTU proposes that it is jointly and severally liable for only part of the damages. UTU argues that the court's September 1989 findings of fact and conclusions of law found the defendants jointly and severally liable on the hybrid claim and found SSW solely liable for all breaches of the March 4 agreement under the statutory cause of action, 49 U.S.C. § 11347. Under UTU's position, SSW is solely liable for damages accruing on or before July 1, 1983 plus interest and for the pool caboose allowance damages plus interest. UTU and SSW would be jointly and severally liable for damages accruing after July 2, 1983.

The court found that the UTU breached its duty of fair representation in the negotiation of the February 23, 1982 implementing agreement and in the negotiations preceding and the presentation of the claims to Arbitrator Warshaw in early 1983. *See* 724 F.Supp. at 1332–33. The court held SSW and UTU jointly and severally liable for damages on the hybrid breach of contract/breach of duty of fair representation claim. *Id.* at 1337. SSW is solely liable on the statutory claim. *Id.* However, the statutory claim is duplicative of the contract claim against the employer, *id.* at 1284, and the court did not assess separate damages on the statutory claim. *See id.* at 1333–34; *id* at 1336–37.

■ UTU argues that SSW is solely liable for all breaches of the March 4 agreement. As such, UTU asserts that SSW is solely liable for all pool caboose damages and all damages attributable to failure to hire class members. UTU asserts that on the hybrid action, UTU and SSW are jointly and severally liable for all back pay damages after July 2, 1983 (the assumption being that July 1, 1983 was the date of hiring). The court must reject UTU's argument. Nothing in any of the court's prior rulings supports the UTU's dual calculations of damage liability for 1983. The court notes here that UTU's breaches of its duty of fair representation began approximately two years prior to July 1983. *Id.* at 1329–33. The court has previously ruled that SSW and UTU were jointly and severally liable. The court made no distinction among the "failure to hire" damages, the pool caboose allowance damages, and all other damages. UTU is jointly and severally liable for the damages it attributes to the failure to hire class members. The pool caboose allowance is a rate of pay or a fringe benefit. *Id.* at 1336. As such, it is properly a part of the back pay damages being assessed against SSW and UTU jointly and severally. UTU is jointly and severally liable for all aspects of the damage award.

## VI. 1982 Hires' Damages

Plaintiffs have submitted a supplemental proposed judgment, Doc. 430. Plaintiffs' original proposed judgment failed to include

back wage damages for the plaintiffs who should have been hired in Pratt in July 1982.

The court previously ruled that the Rock Island employees hired in late 1982 should have worked in the jobs that were given to certain Pine Bluff employees at Pratt in July 1982. The court ruled that those class members were entitled to recover back wages and protective pay for the intervening period until they were actually hired. 724 F.Supp. at 1336. The court subsequently ruled that the back wage damages for the nine class members should be computed using the monthly average earned by the Pine Bluff employees. Protective pay would be due for any month in which the back pay award fell below the wage guarantee amount. Doc. 330, at pp. 37–38.

In its response brief, UTU notes the court's previous ruling that the Pine Bluff employees' average earnings are to be computed on a monthly basis. In reply, the plaintiffs concede they erred in computing the monthly wage to be attributed to the Pine Bluff employees. Plaintiffs have accepted the average wage as computed by UTU.

UTU argued in its response brief that specific dollar figures for the claimants' wages were erroneous. UTU relied on SSW's Trial Exhibit 166. Counsel for UTU stipulated at the hearing that that exhibit was in error. UTU agreed to stand on the submissions of the plaintiffs. The court accepts plaintiffs' computations on the 1982 SSW wages of the claimants and plaintiffs' treatment of the payments received from the Rock Island bankruptcy trustee.

UTU has made specific objections to the computation of protective pay for the claimants. UTU disputes the claiming of three months' protective pay for each claimant. UTU contends that four employees (Schneider, Bettles, Becker and Cooper) were hired in November 1982, not December 1982, and that they should have only two months of protective pay. UTU contends that one employee (Kelso) was not hired in November or December 1982 and that he should have four months of protective pay. Plaintiffs argue that the UTU has incorrectly computed the amounts of protective pay. After consider-

ing the arguments of the parties, the court agrees with the position taken by plaintiffs in their reply brief. The protective pay damages are to be computed according to the formula prescribed in the March 4 agreement.

UTU has repeated its position that it cannot be held liable for any claims based on failure to hire. UTU asserts that the damage claims of the 1982 hires should be imposed only against SSW. The court again rejects UTU's contention that it cannot be held liable for the damages.

## VII.  Damages

■  Defendant UTU argues that taxes which would have been withheld from the claimants' back pay must be deducted from the damage award. UTU argues that the damages recoverable from a union for its breach of duty of fair representation are not taxable, while the damages recoverable from an employer for breach of contract are taxable. UTU argues that under 26 U.S.C. § 104(a)(2), the back pay damages are not included in gross income because they are "damages received ... on account of personal injuries...."

Contrary to the argument of UTU, this court reads *United States v. Burke*, —— U.S. ——, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) as indicating the damage awards in the present case are taxable. In *Burke*, the Supreme Court held that a back pay award received in settlement of a claim under Title VII of the Civil Rights Act of 1964 was not excludable from gross income as damages for personal injuries. *Id.* at ——, 112 S.Ct. at 1874. Similarly, the back pay awards received by the plaintiffs herein would not be excludable from gross income as damages for personal injuries. Plaintiffs will be required to pay income taxes on the back pay damages. No deduction shall be made from the gross back pay award to account for income tax withholdings.

Likewise, plaintiffs are required to make contributions for railroad retirement benefits out of their back pay damage awards. Thus, there should be no deduction from the gross damage award to reflect the railroad retire-

ment contributions that would have been made in prior years.

Defendant UTU has proposed what is being referred to as the "negative damage adjustment" or "negative wage differential," while plaintiffs propose a "zero wage differential." UTU proposes to carry forward a claimant's excess interim earnings into future years so as to reduce damages awarded for later years. Plaintiffs propose to zero out damages in any year the claimant's actual income exceeds the calculated average wage being used as the measure of damages. The dispute arises for any year in which a plaintiff's actual interim earnings (including any buyout payments) exceeded the average wage used for computation of damages.

Since the parties have provided no case law on this subject, the court rules as follows. If a class member earned more than the average wage during a given year, that class member will be awarded no damages for that year. However, to carry forward a negative damage amount into the next year would penalize a class member who was a productive worker and who properly mitigated damages. Thus, excess actual interim earnings shall not be carried forward to future years to reduce the damage award for future years.

Buyout payments are to be treated differently, however. A buyout payment includes a component to compensate the claimant for waiving future employment rights. Thus, the amount by which a buyout payment (added to actual interim earnings) exceeds the average wage may properly be carried forward to the next year so as to reduce damages in that year.

Defendants proposed that damages be reduced by the greater of the claimant's actual interim earnings or the earnings of *any* lower seniority class member. The court has previously ruled that the average earnings of the off-line former Rock Island employees would be imputed to the 1983 hires as the measure of what the 1983 hires could have earned. If in any year a claimant did not earn as much as the average of the off-line employees, the average earnings of the off-line employees should be used as a setoff. This is because the 1983 hires were all above the off-line employees on the seniority roster

and could have bumped them in the event of a layoff or lack of work. *See* Doc. 330 (July 24, 1991 memorandum and order). The court rejects the argument that the earnings of any lower seniority class members should be used.

## VIII. Costs and Attorney Fees

Costs are to be awarded as a part of the judgment. Plaintiffs shall submit their bill of costs, 28 U.S.C. § 1920, pursuant to the provisions of D.Kan. Rule 219.

The court has previously ruled that attorney fees would be awarded pursuant to the "common benefit" exception to the American Rule. Since that time, the Tenth Circuit ruled in *Aguinaga v. United Food and Commercial Workers International Union,* 993 F.2d 1480 (10th Cir.1993), that attorney fees are not recoverable under the common benefit exception to the American Rule in a hybrid breach of contract/breach of duty of fair representation case. The court invites immediate comment regarding whether attorney fees may be awarded in the present action. However, the issue of attorney fees shall not delay the entry of final judgment. Counsel for plaintiffs shall amend the proposed journal entry to specify that if the court ultimately rules that an award of attorney fees is appropriate under applicable law, the court shall award attorney fees after a later hearing.

**IT IS BY THE COURT THEREFORE ORDERED** that the motion to intervene (Doc. 446, Doc. 448) filed by plaintiffs Moore, Callaway and Humble is hereby denied; however, the plaintiffs represented by counsel Bruce Stoltze are granted leave to pursue an independent appeal.

**IT IS FURTHER ORDERED** that plaintiffs R.D. Miller, C.D. Crane and D.W. Frank be awarded back pay consistent with the rulings contained in this memorandum and order.

**IT IS FURTHER ORDERED** that plaintiffs R.D. Parker and C.O. Jones be awarded back pay consistent with the rulings contained in this memorandum and order.

IT IS FURTHER ORDERED that plaintiffs' motion to approve journal entry of final judgment (Doc. 421) is hereby granted in part and denied in part, as specified in this memorandum and order.

IT IS FURTHER ORDERED that counsel for plaintiffs shall prepare the journal entry of final judgment, incorporating the rulings made by the court herein, and shall submit it to the court within thirty (30) days of the date of this memorandum and order.

IT IS FURTHER ORDERED that defendant UTU's motion to strike affidavit (Doc. 441) is moot.