Prudence HUFFMAN, Plaintiff,

v.

ACE ELECTRIC COMPANY,
INC., Defendant.

No. 94–2030–RCN.

United States District Court,
D. Kansas.

March 6, 1995.

Fred Spigarelli, Pamela G. Phalen, Spigarelli, McLane & Short, Pittsburg, KS, for plaintiff Prudence Huffman.

Garry W. Lassman, Wilbert & Towner, P.A., Pittsburg, KS, James Allan Smith, Daniel F. DuPre, Dan T. Carter, Smith, Currie & Hancock, Atlanta, GA, for defendant Ace Elec. Co., Inc.

## MEMORANDUM AND ORDER

NEWMAN, United States Magistrate Judge.

This retaliatory discharge case was tried to the court on October 3, 1994. Plaintiff presented her evidence and rested. At the close of plaintiff's case, the defendant moved for judgment as a matter of law (doc. 60). The court took the motion under advisement. The defendant presented its evidence and rested. At the close of the defendant's case, defendant renewed its motion for judgment as a matter of law. The court took this motion under advisement. The court has now reviewed the law and the evidence and is prepared to rule. This Memorandum and Order shall constitute the court's findings of fact and conclusions of law.

Plaintiff was employed by the defendant in its production plant in Columbus, Kansas, on March 17, 1981, and continued her employment until she was terminated on September 18, 1992. Prior to her termination, plaintiff was employed as a parts assembler. There is no dispute but that plaintiff's work for the defendant had, at all times material, been satisfactorily performed. Throughout her employment plaintiff had suffered various work-related injuries and other medical conditions for which she was off work for periods of time. However, until May 23, 1990, plaintiff had not filed a workers compensation claim. Commencing in 1986 or 1987, plaintiff began suffering certain pulmonary problems for which she received medical treatment. She was off work for substantial periods of time, but returned to work in August 1988, after several months of absence. During this period, her leave was considered medical leave unrelated to her employment and she received temporary disability payments under the employer's disability policy at the rate of $125.00 per week.

In November 1989, plaintiff developed a persistent cough. On December 5, 1989, she consulted her personal physician, Rick L. Scacewater, M.D., who advised her not to return to work for approximately two weeks. This leave was further extended and plaintiff returned to work on January 22, 1990, with a release properly executed by her physician. After several days, plaintiff's cough recurred

and on January 29, 1990, plaintiff left work and went to the company physician, R.L. Andreasen, M.D., who took her off work. She again saw Dr. Andreasen on February 9, 1990, and repetitively thereafter, who recommended that she remain off work for an indefinite period and that she consult with an industrial specialist. On February 19, 1990, Dr. Andreasen noted that he was then waiting for defendant to notify him as to a lung specialist, after consulting with Gallagher Bassett, the claims adjusting firm who handled defendant's workers compensation claims.

On March 20, 1990, the defendant filed an Employer's Report of Accident with the Workers Compensation Director, noting that Dr. Andreasen, the company physician, had advised plaintiff that her cough might be work related. Plaintiff's medical records were sent to the defendant by Dr. Andreasen on March 22, 1990, with multiple notations that he was waiting on defendant to select a consulting physician. On April 11, 1990, plaintiff was referred by Dr. Andreasen to Dr. Harold W. Barkman, a pulmonary specialist, for consultation. Plaintiff saw Dr. Barkman on April 18, 1990, who opined that plaintiff had a work-related cough. Dr. Barkman recommended that plaintiff not return to the "specific environment" in which she had previously worked, and suggested that she might be moved, administratively, to another area of the plant. His recommendations were communicated to Dr. Andreasen by letter dated April 19, 1990.[1]

Plaintiff contacted the defendant about returning to work numerous times between February and April 1990. Each time, plaintiff was told that she would be required to produce a physician's release prior to returning to work. In May 1990 plaintiff again contacted the defendant concerning her return to work. She was advised that prior to returning to work she would be required to have a physician's release by the company doctor. Since Dr. Andreasen had left Columbus, Kansas, and was no longer available to handle matters for the defendant, plaintiff was told that it would be necessary for the defendant to contact Gallagher Bassett concerning the assignment of a new physician to examine her, on defendant's behalf. Plaintiff was also told that the Gallagher Bassett claims adjuster who had previously handled her claim had left the company and that a new adjuster would be designated. Defendant advised plaintiff that, as a result of these changes, it would be at least 45 to 60 days before a physician could be designated to examine her to determine her ability to return to work. Plaintiff was told that she did not need to contact the defendant again, but that the defendant would contact her when a new physician had been designated.

On May 23, 1990, plaintiff filed a claim for workers compensation which has been contested by defendant and remained unresolved at the time of trial. Plaintiff did not return to work due to the defendant's instructions and the company policy requiring that plaintiff be released to return to work after examination by the company physician. Plaintiff remained off work until her employment was terminated on September 18, 1992.

At all times during plaintiff's employment, the defendant had a written policy related to medical leave which was contained in an employee handbook distributed to employees at the time of their employment. It provided for a maximum allowable medical leave of twelve months. It further provided that the company may require its employees to submit to an examination by a physician other than the one selected by the employee and to submit a written release from a physician before returning to work. Employees returning to work after a six-month absence would be reinstated into any open position for which the employee was qualified. This policy was consistently applied prior to plaintiff's termination as related only to non-work-related injuries or illnesses. Employees who were off work due to work-related injuries or illnesses were not terminated. Rather, when employees had disabilities due to work-related illness or injury, defendant made every effort to accommodate their physical limita-

---

1. Between January 29, 1990, and April 18, 1990, plaintiff was treated by Dr. Andreasen, defendant's company physician, and his services were billed to the defendant by letter dated July 5, 1990.

tions and find suitable work for them within their restrictions. Plaintiff was aware of this policy.

Linda Freeman, the employee-relations manager from 1990 to 1992, testified that it was the company's practice not to terminate employees who were off work on medical leave until it was determined whether their medical condition was work related. So long as the diagnosis was unknown, the employee was retained. Ms. Freeman testified that when she left the company, plaintiff's situation had not been resolved as it was unknown whether plaintiff's condition was caused or aggravated by her work. At that time, the company had no medical evidence that plaintiff's condition was not due to or aggravated by her work. Ms. Freeman further testified that had she confirmed that plaintiff's condition was related to her work, she would have tried to keep plaintiff as an employee. Company policy, generally, prior to plaintiff's termination, was to offer available clerical jobs to production employees before seeking new employees. In the opinion of Ms. Freeman, plaintiff had adequate skills to perform certain of the office jobs which had been available between May 1990 and March 1992 when Ms. Freeman left the company.

There was also evidence that plaintiff's disability could have been accommodated by the use of a mask. This issue was not explored by defendant.

The Echlin Company, defendant's parent company, also had policies and procedures which it distributed to its subsidiaries related to medical leave and long-term absences which were effective after July 1, 1982. Policy No. ERP–22 related to long-term absences provides:

I. *POLICY*

   A. Any employee who is absent for a period greater than twelve (12) consecutive months shall be separated from the company. This policy covers non-occupational illness or injury, occupational illness or injury, personal leave and layoffs due to reduction in force.

II. *PROCEDURE*

   A. An employee in any of these circumstances shall upon maintaining inactive status for twelve (12) consecutive months be separated at the end of that period.

   . . . .

   C. If an employee absent for any above reason fails to fulfill the requirements for maintaining inactive status, termination shall take place after a waiting period of three (3) consecutive working days without notification or proof that the terms of the leave have not been observed. Example: Working during authorized leave without the company's approval.

Policy No. ERP–20 related to medical leave provided:

III. *LIMITS*

   A. The total continuous absence shall not exceed a period of time greater than the period of full-time, permanent employment or twelve (12) months whichever is the lesser.

   . . . .

V. *PROCEDURES*

   A. Planned absences

   . . . .

   2. The Employee Relations Department shall be responsible for monitoring the employee's continued ability to perform their assignments via observation and written advisories from the employee's attending physician.

   . . . .

   4. The employee bears sole responsibility for providing the company with a completed attending physician's statement. This statement is required to commence the leave and to extend a leave for additional periods of time as mandated by the attending physician.

   5. The leave and any extension of authorized leave may be granted with proper documentation of need for periods of sixty (60) days or shorter at the discretion of the Employee Relations Manager.

   . . . .

7. Termination of employment shall occur when:

a. The employee fails to apply for a medical leave of absence on a timely basis.

b. The employee fails to apply for an extension of a leave prior to its date of expiration.

## VII. *JOB SECURITY*

. . . .

B. Employee returning from a leave after six (6) months but before the lapse of twelve months, shall be guaranteed a regular job providing they can satisfactorily perform the tasks involved.

There is no evidence that plaintiff was aware of the existence of these specific policy statements or that they were distributed generally to the defendant company's employees although copies were maintained in the personnel office. Notwithstanding the existence of these policy statements, the policy actually followed by defendant prior to plaintiff's termination was that employees were not terminated if their medical leave was caused by a work-related condition, although they had been off work for a period in excess of twelve months.

On July 1, 1992, Pauline Gilroy was transferred from another Echlin related company to the defendant's plant in Columbus, and was designated as its Human Resources Manager, replacing Linda Freeman. She was aware of the company policy as written and of the manner in which it had been applied prior to her arrival at the plant. Upon review of the operations at the plant, she concluded that workers compensation claims' costs were too high due to laxness in the monitoring and management of the claims. She became aware that there were several employees who had been off work for more than twelve months due to work-related injuries, but had not been terminated in accordance with the written policy because of the policy adopted by her predecessors. She first became aware of plaintiff's medical leave on or about September 18, 1992. She knew that plaintiff was not at work due to a medical leave of absence and that plaintiff had

filed a workers compensation claim. Ms. Gilroy terminated plaintiff's employment on September 18, 1992, under Echlin Company Policy No. ERP–20 without notice and without determining her medical status, her ability to return to work, with or without accommodations, or the availability of work which she was qualified to perform. Plaintiff was notified by letter that her employment was terminated, effective that date, due to her failure to apply for a medical leave of absence on a timely basis, her failure to apply for an extension of leave prior to the date of its expiration, and her continuous absence for a period in excess of twelve months.

Thereafter, Ms. Gilroy continued her investigation with respect to other employees who had been off work for more than twelve months. On October 9, 1992, two additional employees were terminated. Another employee was terminated on December 7, 1992. All of these employees were off work due to work-related injuries and had pending workers compensation claims or claims which had been recently resolved at the time of their termination. Ms. Gilroy later terminated other employees on July 20, 1993, and October 9, 1993, under the same policy, each of which had work-related injuries for which they were off work, as well as pending workers compensation claims. There was no evidence that Ms. Gilroy terminated employees under these specific policies, other than those who had pending workers compensation claims.

At the time of termination of her employment, plaintiff was 55 years of age. She did not seek employment because she did not want anyone to know that she had been fired. Plaintiff claims she was so embarrassed by the termination of her employment, she avoided shopping in stores where there were people who might be aware of her termination. She had difficulty sleeping and was depressed as a result of the termination. She did not seek medical or psychological treatment as a result thereof.

Plaintiff subscribed to local newspapers that regularly published advertisements for employment in the manufacturing industry available in various communities near her home. Although plaintiff reviewed the want

ads from time to time, she did not seek employment because she did not want to admit to a prospective employer that she had been fired. There was no evidence by either party as to plaintiff's likelihood of obtaining employment considering plaintiff's claimed industrially-related cough, and the involuntary nature of the termination of her employment.

■ In Kansas, the employer-employee relationship is terminable at the will of either party, in the absence of an express or implied contract. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976). However, there is an exception to the employment-at-will doctrine for employees discharged in retaliation for the exercise of their rights under the Workers Compensation Act. *Murphy v. City of Topeka–Shawnee County Department of Labor Services, et al.*, 6 Kan.App.2d 488, 630 P.2d 186 (1981). An employer is prohibited from firing an employee who is absent from work due to a work-related injury and who has filed or might file a workers compensation claim. *Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188 (1994). The cause of action extends to an employee who is terminated for failing to report to work or failing to call in an anticipated absence as a result of a work-related injury. An employer may not terminate an employee for absences caused by a work-related injury. *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 752 P.2d 645 (1988). However, an employer may enforce an absence policy, neutral on its face, such as the one in issue, notwithstanding the pendency of workers compensation claims. *Huffman v. Ace Electric Company, Inc.*, 1994 WL 583113 (D.Kan.1994); *Rosas v. IBP, Inc.*, 869 F.Supp. 912 (D.Kan.1994); *Rowland v. Val–Agri, Inc.*, 13 Kan.App.2d 149, 766 P.2d 819 (1988). The employer may not use such policy as a pretext for the termination of employees who are off work due to work-related injuries and/or who are otherwise pursuing their rights under the Kansas Workers Compensation Act.

■ In a retaliatory discharge claim, the plaintiff must prove that his discharge from employment was in retaliation for having filed a workers compensation claim by a pre-

ponderance of the evidence, but the evidence must be clear and convincing in nature. *Id.* Clear and convincing evidence was described by the Kansas Supreme Court in *Ortega*, as follows:

> It is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it.

874 P.2d at 1198. Clear and convincing evidence is not a quantum of proof, but rather the quality of proof. *Id.*

■ Kansas has adopted the McDonald–Douglas burden shifting analysis in employment discrimination cases and such analysis has also been applied in retaliatory discharge cases. The burden is on the plaintiff to present a prima facie case of retaliatory discharge. Thereafter, the burden of going forward with the evidence shifts to the defendant, who must present evidence of a legitimate, non-retaliatory reason for its conduct. Once the defendant produces such evidence, the plaintiff must prove by a preponderance of the evidence, that the defendant employer acted with retaliatory intent and that the reasons tendered by the employer were merely a pretext for retaliation. *Ortega*, 874 P.2d at 1196.

■ To establish a prima facie case of retaliatory discharge, the plaintiff must show: (1) that he filed a claim for workers compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of his claim or the fact that he had suffered a work-related injury; (3) that the employer terminated his employment; and (4) that a causal connection existed between the protected activity or injury and the termination. *Id.* 874 P.2d at 1197.

■ Plaintiff has established a prima facie case and this is not seriously disputed by defendant. Further, the defendant has articulated a legitimate, non-discriminatory, reason for its termination of plaintiff, therefore, carrying its burden of production. The remaining issue, therefore, is whether plaintiff has proven by clear and convincing evidence that her discharge was in retaliation for the

exercise of her rights under the Kansas Workers Compensation Act. Applying the standards articulated above, the court finds by a preponderance of the evidence that the defendant terminated plaintiff due to the exercise of her rights under the Workers Compensation Act. The evidence is clear and convincing.

Defendant, concerned about the prior lax handling of workers compensation claims and the increased costs related thereto, determined that employees off work for work-related injuries would be terminated through the use of the written Echlin policy. Between September 18, 1992, and December 7, 1992, four employees with workers compensation claims, including plaintiff, were terminated due to their continuous absence for a period in excess of twelve months. No inquiry concerning plaintiff's medical status was made. No effort was expended to determine whether work was available which plaintiff could perform or whether plaintiff could then return to her job, with or without reasonable accommodations. Rather, plaintiff was terminated by a letter advising her that her termination was pursuant to multiple provisions of the Echlin policy.

Plaintiff's termination was directly contrary to defendant's policy as applied up to the date of her termination. Notwithstanding the language of the company's written statement of the Echlin policy, defendant's policy, as applied for many years, had been that no employee on medical leave due to a work-related condition, was terminated.[2] Defendant's policy prior to plaintiff's termination had been to make an effort to accommodate employees with disabilities, due to work-related injuries, and find suitable work for them within their restrictions. This policy was consistent with the general policy of the company to offer office positions to production employees before going outside the company and to promote from within, if possible.

All of the medical evidence available to the defendant from its own physicians was that plaintiff suffered a work-related disability. Notwithstanding, defendant was contesting plaintiff's workers compensation claim. Yet, defendant did not have plaintiff examined to determine whether she could return to work, with or without accommodation. Prior to the filing of her workers compensation claim, plaintiff had been off work for several months due to the instruction of the company physician who then believed that plaintiff's condition was work-related. Although plaintiff attempted to return to work, she was told by the defendant's employment relations department that she must be examined by another physician of the defendant's choice, after consultation with Gallagher Bassett. After multiple telephone calls to defendant concerning return to work, plaintiff was told that she did not need to contact the company further but rather that the company would contact her when arrangements had been made for her medical examination.

Defendant's termination letter advised that plaintiff was terminated due to her failure to apply for a medical leave of absence and to further apply for extension of that leave prior to its expiration. Termination on such grounds is directly contrary to the principles enunciated in *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 752 P.2d 645 (1988), since plaintiff was known to be off work for a claimed work-related disability. The use of such bases for termination of plaintiff were not only contrary to public policy but are evidence of defendant's unlawful intent. Further, plaintiff had not only applied for her medical leave of absence on a timely basis, the termination of her leave of absence was solely within the control of the defendant who had instructed her that she could not return to work until she was examined by another physician designated by the defendant. No such physician was ever designated by the defendant. Plaintiff's continued absence from her employment was due to

---

**2.** Prior to plaintiff's termination, only one employee had been terminated for continuous absence exceeding one year. In 1987, an employee who had been off work for a period of approximately sixteen months after having been injured in an automobile accident, unrelated to her work, was terminated. The employee was unable to return to work and was unable to perform her prior duties. It was then known that she would not be able to return to work in the future.

defendant's instruction to plaintiff and defendant's inaction in processing her request to return to work.

■ Under the facts before the court, defendant was obligated to determine whether plaintiff could return to her former position with reasonable accommodations and whether there was other suitable work for which she was qualified if she could not return to her former position due to a work-related injury or illness. *Rowland v. Val-Agri, Inc.,* 13 Kan.App.2d 149, 766 P.2d 819 (1988). Defendant made no such determination. Rather, defendant terminated plaintiff under the pretext of the Echlin absence policy never previously applied to the circumstances now before the court. This also is contrary to public policy.

■ Damages are not recoverable for loss which a party could have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation. When a party fails to make reasonable efforts, which result in harm greater than would have otherwise occurred, the party may not recover damages for any amount which was avoidable. While the law does not penalize a party's inaction, it merely does nothing to compensate the party for the harm that a reasonable person would have avoided. *Theis v. duPont,* 212 Kan. 301, 510 P.2d 1212 (1973). The defense of failure to mitigate damages is an affirmative defense and the burden is upon the employer to prove the facts of failure to mitigate. *Krehbiel v. Goering,* 179 Kan. 55, 293 P.2d 255 (1956). An employer must satisfy a two-part test to establish the defense of failure to mitigate: (1) that the damages could have been avoided, *i.e.,* that suitable positions were available which plaintiff could have discovered and for which the plaintiff was qualified; and (2) that the plaintiff failed to use reasonable care and diligence in seeking such positions. *Eslinger v. U.S. Central Credit Union,* 866 F.Supp. 491 (D.Kan.1994). The employer must satisfy both prongs of the test. *Volkman, et al. v. United Transportation Union, et al.,* 826 F.Supp. 1253 (D.Kan. 1993). To prevail on a mitigation defense, the defendant must show that there was reasonable likelihood that plaintiff might

have found comparable work if he had exercised reasonable diligence. *Ross v. Unified School District No. 231, Johnson County, Ks.,* 1993 WL 62442 (D.Kan.1993). Reasonable efforts are determined by the economic climate, the worker's skill, qualifications, age, and personal limitations. *Volkman, et al. v. United Transportation Union, et al.,* 826 F.Supp. 1253 (D.Kan.1993).

■ It is undisputed that plaintiff did not seek other employment. The defendant offered want ads in various newspapers available to plaintiff commencing on September 18, 1992, and continuing through January 16, 1994, reflecting available employment for manufacturing and clerical positions. While there were numerous clerical positions available prior to January 9, 1993, which required computer skills, which plaintiff did not then have, only one full-time general manufacturing position was advertised. Thereafter, manufacturing positions were regularly advertised.

■ The court finds that plaintiff failed to use reasonable care and diligence in seeking employment and that most of her economic damages could possibly have been avoided had she attempted to look for work. Although defendant has not established that plaintiff would have been employed had she applied, defendant has established that positions were available for which plaintiff was qualified after January 9, 1993. Plaintiff may well have had some difficulty in obtaining employment due to her age, physical condition, and the circumstances of the termination of her employment had she made an effort to locate employment. However, her claim that she was embarrassed that she had been fired and consequently could not bring herself to admit such to prospective employers does not excuse her failure to attempt to mitigate her damages. Plaintiff may not recover for economic damages incurred after January 1993.

■ The court finds that plaintiff has suffered economic damages in the amount of $5670.00, which represents the eighteen week period from termination to the date when regular manufacturing positions were reasonably available to her.

The evidence further establishes that plaintiff did suffer emotional distress, embarrassment, and humiliation as a result of the termination of her employment. The court finds that plaintiff has suffered non-economic damages in the amount of $15,000.00.

Judgment is entered in favor of plaintiff against defendant for the sum of $20,670.00 and the costs of this action. Defendant's motion for judgment as a matter of law is overruled (doc. 60).

IT IS SO ORDERED.