Jan ALI and John Ham, Plaintiffs,

v.

DOUGLAS CABLE COMMUNICATIONS, Limited Partnership, Reavis D. Gibb, Jeffrey L. Scheidegger, and Devon Plumberg, Defendants.

No. 94–1146–SAC.

United States District Court, D. Kansas.

May 24, 1996.

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for plaintiffs.

Randall J. Forbes, Nola Wright Viola, Frieden, Haynes & Forbes, Topeka, KS, for defendants.

Anne L. Baker, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, Topeka, KS, for movant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendants' motion for summary judgment (Dk.159). The plaintiffs bring this action alleging the defendants violated the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, by monitoring and recording their telephone calls at work. The plaintiffs further claim that the defendants terminated their employment in retaliation for their complaints about this monitoring of telephone calls and for their reports of a co-worker's theft of commissions and fraudulent reports of business transactions. The plaintiffs also have claims for negligent infliction of emotional distress, intentional infliction of emotional distress, defamation, and invasion of privacy. The defendants seek summary judgment on all claims.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met,

**1372**

the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

The court considers the following facts to be uncontroverted for purposes of this motion only.

Douglas Cable Communications ("DCC") hired the plaintiff John Ham ("Ham") initially as a part-time customer service representative ("CSR") on November 18, 1991. DCC also initially hired the plaintiff Jan Ali ("Ali") in the same position on July 7, 1992. A CSR's principal duties include speaking with customers over the telephone about sales, complaints, collection of delinquent accounts, and follow-up. The defendant Reavis Gibb has been the operations manager for DCC since 1986. The defendant Jeffrey Scheidegger has worked for DCC since 1986 holding various positions, including controller, director of operations, and director of customer service. The defendant Devon Plumberg was a training supervisor for CSRs from August of 1992 through December of 1993.

In October of 1992, Ham complained to Patty Shaver,[1] Devon Plumberg and Jeffrey Scheidegger that he believed another CSR, Marcia Trickett, was manipulating the DCC computer system for her personal gain. Specifically, Ham complained that Trickett was stealing commissions from other CSRs and was creating bogus accounts for which she was paid commissions. At the request of Scheidegger and others, Ham compiled and produced documents which ostensibly substantiated what he was alleging. The DCC management reviewed these documents and also investigated the allegations. In Trickett's entries, they found evidence of suspicious circumstances and work inconsistent with training guidelines. Near the end of October and first part of November of 1992, Shaver informed Trickett that because of discrepancies in her work entries found by her co-workers she was being placed on a thirty-day probationary period and subjected to disciplinary measures, including additional reporting requirements, daily review of reported sales and adjustments, and monitoring of sales calls. The written disciplinary warning[2] ended with: "An administrative re-

1. Ms. Shaver was a Customer Service Supervisor for DCC. She supervised the CSRs, assisted with CSR training, set the CSRs' work schedule, and assured prompt answering of telephone calls. She assisted in the training of the plaintiffs.

2. In July of 1993, another employee, Steve Krueger, complained that Trickett had moved a

work order on the computer. DCC corrected the work order and suspended Trickett for three days without pay. In November of 1994, DCC terminated Trickett based on information from another CSR, Sue Schwindler, that Trickett had taken an unserviceable account sold by Schwindler and credited to Trickett's account as an active customer.

view will be conducted on December 8, 1992, to affirm Marcia has corrected the improprieties. Further deviations will result in disciplinary actions not excluding termination." (Dk.160, Ex. A).

Ham continued to complain to Scheidegger about Trickett's actions. Ham met with Scheidegger four or five times, produced additional documentation about his complaints, and asked why Trickett had not been disciplined or fired. Apparently frustrated by Scheidegger's responses to his questions and efforts, Ham threw papers up in the air and walked out of one of the meetings. In one or more of the meetings, Ham accused Scheidegger of not acting on his complaints because Trickett's bogus accounts benefitted DCC by increasing the availability of financing which was based on the number of customer accounts. At another meeting near March of 1993, Scheidegger told Ham "to shut the fuck up and sit down and not say another word about anything that's going on here, or you will lose your job." (Ham Dep. at 206). Ham described work as "crazy," "as soon as I walked in, I had to hard copy anything that anyone around had done. I was trying to prove what Marcia had done. I was trying to figure out why Jeff wasn't doing anything about what Marcia had done." (Ham Dep. at 171). Ali printed each of her sales and took the ones that did not close properly to Ham who investigated them.

Because the CSRs' principal contact with customers was over the telephone, DCC management monitored the CSRs' telephone conversations for purposes of training CSRs and improving customer service. Specifically, the supervisors used their extension telephones to monitor CSRs in the use of proper skills and to assist the CSRs with difficult customers. Some of the CSRs knew of the telephone monitoring because the supervisors had used it during their training, and other CSRs, like the plaintiffs, were not aware of it. Devon Plumberg testified that notices regarding the monitoring were posted on a bulletin board and on a computer "billboard." Others could not remember seeing the notice posted at either place. Ms. Plumberg testified that if the CSR received a personal call then she would stop monitoring that call. CSRs were not told that personal calls could not be made at their desk, and their supervisors knew that personal calls were being made and received at the CSRs' desks.

In early 1993, DCC management decided that recording CSR conversations for later review would be an aid in training and supervision and in participating in Home Box Office sponsored contests. Memoranda and staff agenda were distributed beginning in February of 1993 to the staff informing them first of the decision to add "recording mechanism to monitor CSR phone calls" and then the management's progress in acquiring the equipment and having it installed. (Dk.160, Ex. 15). In purchasing this equipment, DCC management contacted Wiltel which had provided DCC the telephone equipment it was using. Wiltel contracted with another company, Comtronics, in acquiring the ancillary equipment needed for recording the calls. Wiltel installed the recording equipment which was connected to an extension telephone which had access to the CRSs' different lines. The supervisor would set the equipment to record all phone calls made on a particular phone line. The equipment would then activate automatically when a call was received or made, and it did not distinguish between business or personal calls.

A memorandum dated April 6, 1993, from Devon Plumberg distributed to the CSRs informed them that:

> Documentation of sales and save techniques will begin this week with the installation of our recording device. I will be recording five CSRs' activity this week: Jan Ali, John Ham, LeaAnn Husted, Janell Porter and Jennifer Wise. I have scripted the specific steps a CSR must go through for both the selling process and retention process as the basis for evaluating these recordings.

(Dk.160, Ex. 12). Both Ali and Ham became aware of this memorandum on Friday, April 9, 1993. Before April 9th, Plumberg apparently recorded approximately one to one and one-half hours of telephone calls for each plaintiff over two business days. DCC did not install a pay or personal phone for CSRs to use for personal calls until April 19, 1993.

Because Ham was making numerous personal phone calls while at work, he was furious that his telephone calls might be recorded. When Ham complained about the recording, DCC management sought the legal advice of their attorney. The letter opinion dated April 29, 1993, concluded that DCC's "proposed practice of monitoring and taping some of the phones used by the CSR's (sic) is lawful and appropriate," and suggested some additional measures to insure "maximum insulation from civil liability." (Dk.160, Ex. 81). The management shared this letter opinion with the CSRs.

The weekly sales activity reports and the summary of basic sales activity showed that Ham and Ali were not meeting performance expectations for the first part of 1993. In a memorandum dated February 12, 1993, Ham received a memorandum from Ms. Shaver that criticized his behavior and attitude at work. She referred to several instances of customer complaints about rudeness and failure to place a work order, of improper handling of DCC payments, and of studying at work. In a memorandum dated February 5, 1993, Steve Krueger[3] criticized Ham's handling of orders and checks. He had found several checks on Ham's desk, and some of them dated back to October of 1992. Krueger wrote: "I know John knows not to have money around that long. I give up on baby-sitting him. I'm not asking you to fire him, but he is no longer any asset of our Iowa team." (Dk.160, Ex. 20). On March 2, 1993, Ham received a memorandum from Devon Plumberg on his failure to meet his weekly sales goals over the last nine-week period. Despite the warning, Ham's sales did not improve. Ham says his performance had not been criticized until he began arguing with Scheidegger over not taking action against Trickett. During the first part of 1993, Ham twice threw papers in the air in disgust in front of his supervisors. His supervisors considered such behavior to be insubordinate temper tantrums. DCC management found that Ham was performing poorly because of his delinquent handling of checks, declining sales, and insubordinate behavior towards supervisors.

A week or two weeks after returning to work from a medical absence, Scheidegger requested a note from Ham's doctor concerning the absence. The next day Ham sent Scheidegger a note dated April 15, 1993, that said, "After speaking to my atty. I have decided against obtaining a physician's note." (Dk.160, Ex. 29).

On April 19, 1993, Shaver called Ham and told him that he was not scheduled to work that day. When Ham inquired who else was not scheduled to work, why he was selected, and when he would be scheduled to work again, Shaver answered that the work schedules were not completed and that she did not know when Ham would be scheduled. Ham told Shaver that he was coming to work anyway and "have a little meeting and you guys can tell me exactly who else besides me that you are putting on temporary." (Dk. 172, Ex. H at 8).

Ham talked with Scheidegger and Shaver in Scheidegger's office. Ham repeatedly asked why he was not scheduled to work, and Scheidegger refused to give him a reason. Ham and Scheidegger raised their voices and appeared agitated. Ham carried a concealed voice-activated tape recorder during that meeting, and a transcript of the recording shows that Scheidegger placed Ham on inactive part-time status and that Ham insisted on being provided a written reason for this decision. After a while, Scheidegger asked Ham to "vacate the building" and repeated that request numerous times when Ham refused to leave. (Dk. 172, Ex. L at 5–10). Ham became disruptive and attempted to talk with others who were working at the time.

Just before leaving, Ham told Scheidegger: "Oh by the way Jeff, I'll see you later.... It's been fun believe me and it's even going to be a lot more fun. And I hope that all these people around here do the same thing that I'm gonna do to you.... Sweet dreams." (Dk. 172, Ex. L at 10). Scheidegger perceived Ham's comments as threatening, and the police were called. The officers were given Ham's name. An officer escorted the employees to their cars. The locks on

3. Ham testified that he explained to Krueger some of the late checks laying on his desk.

DCC's building were changed, and all CSRs were required to enter through the front door. Employees were told to hang up if Ham called and to alert the police if he was seen on the premises. Shaver told another CSR that afternoon or the next day that Ham seemed to be the kind of person who would "come in with a gun and shoot everybody." (Trickett Dep. at 61). When Ham called Scheidegger later to ask for his personnel file, Scheidegger told him that it would be mailed to him and that he need not come to DCC, that he was perceived as "dangerous" and "irrational," and that the police would be called.

During his employment with DCC, Ham claims he suffered a physical injury from the stress. On March 2, 1993, Ham was seen at the emergency department of Stormont–Vail Regional Medical Center in Topeka for complaints of a rapid heart beat. Ham told the hospital personnel that he had been under stress and had consumed a large amount of caffeine through beverages. The progress notes from Ham's physician dated March 3, 1993, show sinus tachycardia "probably due to the number of stimulants that he currently has in his diet." The physician's notes for March 4, 1993, state: "Patient has continued to have problems with withdrawal from taking large amounts of caffeine daily. He is having problems with restlessness and anxiety." (Dk.160, Ex. 54). He wore a monitor for twenty-four hours to monitor the rate of his tachycardia, and the results were benign. The notes from March 8, 1993, show that Ham improved with the Xanax medication and that the physician thought a low dosage of Xanax on a permanent basis might be appropriate considering Ham's "history of anxiety neurosis or panic disorder." (Dk.160, Ex. 54).

Jan Ali's sale performance also declined, and she was not meeting her sales goals and was missing work. It appears Ali's absences were due to a medical leave of absence. Ali wrote a memo to Scheidegger complaining about the scheduling of training sessions and remarking that, "It wouldn't be so bad if we would actually learn something valuable at these sessions." (Dk.160, Ex. 44). In July, Ali received a letter from Shaver that said it had been determined during her thirty-day absence that her services were no longer needed.

To support her claim of physical injury, Ali refers to three different instances when she sought treatment from area hospitals. In January of 1993, she was hospitalized for several days with right lower lobe pneumonia. On November 17, 1993, over four months after termination, Ali visited a hospital emergency department with complaints of itching. In December of 1993, she presented to the emergency room again, but this time she complained of coughing and large red spots on her throat. Ali testified that her last two visits also included treatment for red bumps or rash that Ali says her physician diagnosed as caused by anxiety. Ali's physician testified that the rash was caused by medication that Ali had taken in error.

Ali testified that she had several meetings concerning the recording of CSRs' telephone calls and that she complained to Shaver and Plumberg about lost commissions and bogus accounts caused by Trickett. According to Ali, at her last visit with Scheidegger about recording telephone calls, Scheidegger became angry and warned her that "if I mentioned the words John Ham or wire tapping or eavesdropping to any technician or customer or customer service rep, I would be fired within the hour." (Ali Dep. at 127).

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

The plaintiffs claim that the defendants by monitoring and recording the CSRs' telephone calls violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq. ("Title III"). This Act prohibits the interception and disclosure of wire communications subject to certain express exceptions and allows for the victim to recover damages in a civil action. 18 U.S.C. §§ 2511, 2520. The defendants argue the interceptions here come within the recognized exceptions for consent and business extensions.

Section 2511(1)(a) prohibits the intentional interception of any wire communication. " 'A telephone conversation is a wire conversation.' " *Forsyth v. Barr*, 19 F.3d

**1376**

1527, 1534 (5th Cir.) (quoting *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 417 (5th Cir.1980)), *cert. denied,* — U.S. ——, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). Because the statute speaks of "intentional" interceptions, liability will not attach from inadvertent interceptions. *Thompson v. Dulaney,* 970 F.2d 744, 748 (10th Cir.1992). There seems little dispute that the defendants violated Title III unless their conduct comes within one of the argued exceptions. On the consent exception, the defendants argue that the plaintiffs consented to the monitoring and recording as other DCC employees knew supervisors were monitoring CSRs' telephone calls and were purchasing equipment for recording the CSRs' telephone calls. On the business extension exception, the defendants argue the interception was done in the ordinary course of business with an extension telephone. Because these exceptions are "analytically separate,"[4] the court will analyze the consent exception first.[5] *See Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 581 (11th Cir.1983).

■■■■■ The consent exception appears at § 2511(2)(d), which provides:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

" 'Consent may be actual or implied.' " *United States v. Amen,* 831 F.2d 373, 378 (2nd Cir.1987) (quoting S.Rep. No. 1097, 90th

Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2182), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988); *see Williams v. Poulos,* 11 F.3d 271, 281 (1st Cir.1993). " '[I]mplied consent is "consent in fact" which is inferred "from surrounding circumstances indicating that the party knowingly agreed to the surveillance." ' " *Williams,* 11 F.3d at 281 (quoting *Griggs–Ryan v. Smith,* 904 F.2d 112, 116–17 (1st Cir.1990) (quoting in turn *United States v. Amen,* 831 F.2d at 378)). "[I]mplied consent should not be casually inferred." *Williams,* 11 F.3d at 281 (citation omitted). The circumstances giving rise to implied consent are case specific, but they "ordinarily include language or acts which tend to prove (or disprove) that a party knows of, assents to, encroachments on the routine expectation that conversations are private." *Griggs–Ryan,* 904 F.2d at 117. " 'Knowledge of the *capability* of monitoring alone cannot be considered implied consent.' " *Deal v. Spears,* 980 F.2d 1153, 1157 (8th Cir.1992) (quoting *Watkins v. L.M. Berry & Co.,* 704 F.2d at 581). Consent is not necessarily "an all or nothing proposition," *Watkins,* 704 F.2d at 582, and its scope or its parameters can be circumscribed by the understandings and facts in a given case, *Griggs–Ryan,* 904 F.2d at 119.

■■■■■ The plaintiffs deny knowledge and acquiescence in the monitoring[6] of their telephone calls. It is uncontroverted that some of the CSRs knew of the defendants' monitoring practice while other CSRs did not. The circumstances under which certain CSRs learned of the monitoring goes to the plaintiffs' credibility in denying knowledge, for it is controverted whether the defendants formally announced they would monitor CSRs'

---

**4.** The consent exception does not turn on the business nature of the telephone call, and the business extension exception functions without regard to the consent of either party. *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 581 (11th Cir. 1983).

**5.** The court not only divides its discussion between the two exceptions, but it also separates its analysis, conceptually and temporally, between the monitoring in person and recording by machine and between the plaintiff Ham and the plaintiff Ali.

**6.** The court admits its analysis of the monitoring claim appears superficial. This is due to the parties' failure to discuss the exceptions and the acts of monitoring and recording separately. The evidence concerning the monitoring claim is skeletal at best. The defendants do not deny that the plaintiffs' calls were monitored, but the evidence of record does not show when or how often this monitoring occurred.

calls and whether the defendants established a formal policy or procedure for monitoring CSRs' calls which was communicated to the CSRs. The defendants appear to have known that CSRs made or received personal phone calls at their desks, and there is no evidence of record that the CSRs were discouraged from doing the same. In fact, prior to Ham's discharge, the defendants had not provided CSRs with a separate phone for making personal phone calls. The evidence is enough to create a genuine issue of material fact whether the plaintiffs consented to the monitoring of their telephone calls.

As for the recording, the defendants in February, March and April announced in staff memoranda their intention to acquire a system for recording the CSRs' telephone calls. Prior to the memorandum of April 6, 1993, the defendants, however, did not disclose or describe the manner in which they intended to use the recording equipment. Ham and Ali apparently did not learn of the contents of the April 6th memorandum until April 9, 1993. Ham's testimony is that Ali called him about the April 6th memorandum and that he then complained immediately to Plumberg. The evidence shows that Ham called Plumberg on Friday, April 9, 1993, inquired about DCC's recording of telephone calls, and complained that the recording was unlawful. Plumberg testified that some of Ham's telephone calls had been recorded before April 9, 1993. The evidence simply is not sufficient to infer as a matter of law that Ham impliedly consented to any recording of his telephone calls before or after April 9, 1993. As for Ali, she too did not learn of the April 6th memorandum until April 9, 1993, and then immediately questioned Shaver and Plumberg about the recording of calls. She learned from Plumberg that some of her calls had already been recorded prior to receiving the memorandum. The court finds genuine issues of material fact remaining as to Ali's implied consent to the recording of telephone calls.

In sum, the plaintiffs have come forth with sufficient evidence suggesting the absence of either full knowledge or adequate notification, from which consent can be implied. Neither plaintiff was in an actual position where he or she necessarily would have learned of the monitoring. The monitoring and recording were done without beep tones or other signals indicating their use. There were no labels on the CSRs' phones or other written policies distributed to the CSRs that warned them of monitoring and/or recording of telephone calls and that cautioned them against making personal phone calls at their desks. Prior to Ham's departure, DCC had not provided CSRs with a private telephone from which they could make personal phone calls. DCC made no effort to obtain the written consent of the CSRs prior to monitoring and recording their telephone calls. Nor does DCC offer evidence of the CSRs openly and frequently discussing the monitoring and recording as a routine and pervasive practice at DCC. Genuine issues of material fact surround the consent exception.

■■■■■ When §§ 2510(4) [7] and (5) of Title III are construed together, they create an exception for extension or business extension telephones. *United States v. Murdock,* 63 F.3d 1391, 1393 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996). Title III defines "electronic, mechanical, or other device," as used in § 2510(4), to not include:

> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business;
> . . . .

18 U.S.C. § 2510(5)(a). Thus, this exception "places outside the reach of Title III the monitoring of communications carried out by certain types of equipment and done in the

---

**7.** This section provides: "(4) 'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any *electronic, mechanical, or other device.*" (underlining added).

ordinary course of business." *Williams v. Poulos*, 11 F.3d 271, 279 (1st Cir.1993).

■■■ The first prong under this exception is whether the equipment used by DCC to monitor and record the CSRs' calls qualifies as § 2510(5)(a) equipment. There are two ways that this prong can be met: (1) the provider of wire communication service furnishes the equipment in the ordinary course of its business, or (2) the subscriber or user furnishes the equipment for connection to the wire communication facilities. 18 U.S.C. § 2510(5)(a); *see Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 n. 9 (4th Cir.1994).

■■■ DCC represents that its telephone system, including the telephones used to monitor the CSRs' calls, was provided by Wiltel, a licensed telecommunications company, in the ordinary course of Wiltel's business. *See Deal v. Spears*, 980 F.2d at 1158 (Radio Shack is not a telephone company). Even if Wiltel is not a provider of wire communication service, DCC acquired the supervisors' extension telephones "for connection to the facilities" of its existing wire communication service. 18 U.S.C. § 2510(5)(a); *cf. Williams v. Poulos*, 11 F.3d at 280–81. The extension telephones plainly enabled the supervisors to become a party to telephone conversations between customers and CSRs and, thus, the extension telephones furthered DCC's communication system. *See Sanders*, 38 F.3d at 741. Courts repeatedly have treated extension telephones as telephone equipment. *See, e.g., Newcomb v. Ingle*, 944 F.2d 1534, 1535–36 (10th Cir. 1991), *cert. denied*, 502 U.S. 1044, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); *Royal Health Care Services v. Jefferson–Pilot Life Insurance Co.*, 924 F.2d 215, 217 (11th Cir.1991); *Watkins v. L.M. Berry & Co.*, 704 F.2d at 582–84. As for the recording equipment, it merely "preserve[d] the contents of the communication." *United States v. Harpel*, 493 F.2d 346, 350 (10th Cir.1974). Because the recording equipment was attached to the telephone extension, the extension is the device that intercepts the communication. *Id.;*

*see Royal Health Care Services v. Jefferson–Pilot Life Insurance*, 924 F.2d at 217; *But see United States v. Murdock*, 63 F.3d at 1394; *Sanders*, 38 F.3d at 740 n. 8; *Deal*, 980 F.2d at 1157–58; *Pascale v. Carolina Freight Carriers Corp.*, 898 F.Supp. 276, 279–81 (D.N.J.1995). Bound by the Tenth Circuit precedent, the court finds that the first prong of the business extension exception is satisfied.

The other prong to this exception is that DCC used the intercepting equipment in the ordinary course of its business. *Sanders*, 38 F.3d at 740; *Deal*, 980 F.2d at 1157. Before going to the general rules developed in other circuits, this court first must determine the parameters set by controlling Tenth Circuit precedent. *See Morris v. State of Kan. Dept. of Revenue*, 849 F.Supp. 1421, 1428 (D.Kan.1994).

In *United States v. Harpel*, the defendant was charged and convicted of disclosing an unlawfully intercepted wire communication. The evidence at trial adduced that Harpel played a recording of a telephone conversation between a police officer with the Pueblo, Colorado Police Department and agents of the Bureau of Narcotics and Dangerous Drugs in Denver, Colorado. The evidence, however, did not prove who recorded the conversation or the manner in which it was recorded. On appeal, Harpel argued the call was not an unlawfully intercepted wire communication pursuant to the telephone extension exception. The Tenth Circuit affirmed the conviction holding:

> What appellant Harpel has overlooked in his reliance on the exception is that the telephone equipment must be used "in the ordinary course of business." We hold as a matter of law that a telephone extension used without authorization or consent to surreptitiously record a private telephone conversation is not used in the ordinary course of business.

493 F.2d at 351.[8]

In *James v. Newspaper Agency Corp.*, 591 F.2d 579 (10th Cir.1979), the defendant em-

---

8. The Fifth Circuit in *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 419 (5th Cir.1980), pointed out the ambiguity in the Tenth Circuit's language in *Harpel*, "without authorization or consent to surreptitiously record." The Fifth Circuit persuasively observed that if the Tenth Circuit meant to say the "authorization or consent" by a party to the intercepted communica-

ployer installed telephone monitoring devices in those departments that typically dealt with the public. All employees affected by the monitoring were notified in writing of the decision to install monitoring devices. The plaintiff's duties included collection of unpaid bills from transient advertisers. The employer's purposes in monitoring business calls was to assist supervisors in training and instructing employees on how to deal with the public and to protect employees from abusive calls. 591 F.2d at 581. The Tenth Circuit affirmed the summary judgment granted for the employer:

As above mentioned, the evidentiary matter before the trial court when it granted summary judgment in favor of the defendant on the wire interception claim showed that the defendant had requested the telephone company to install a monitoring device which would permit the defendant to listen in on telephone conversations between its employees and its advertisers, and others. This was a part of the service rendered by the phone company on request. As indicated, the reason for the installation was the concern by management over abusive language used by irate customers when called upon to pay their bills, coupled with the possible need to give further training and supervision to employees dealing with the public. The installation was not done surreptitiously. Rather, all employees were advised in advance, in writing, of the proposed installation, and there was no protest. In our view, the present case comes squarely within the exception provided in 18 U.S.C. § 2510(5)(a), and it is on this basis that we affirm the summary judgment granted the defendant on the second claim.

We do not regard our holding in the instant case to be at odds with *United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974). In *Harpel*, we held that the surrep-

titious use of a telephone extension to record a private telephone conversation did not qualify as an exception under 18 U.S.C. § 2510(5)(a), since such was not in the "ordinary course of business." Here the installation was not surreptitious, but with advance knowledge on the part of both management and its employees, and was for a legitimate business purpose.

591 F.2d at 581–82.

For purposes of this case, there are some obvious reasons for narrowly reading the holdings in *Harpel* and *James* on what constitutes "in the ordinary course of business." First, they were decided more than twenty years ago when the case law on this issue under Title III was still emerging. After these decisions were handed down, other circuits have had the chance to discuss this issue in different contexts and to fashion some accepted rules of general applicability. Second, language and analysis from the consent exception creeps into the discussion of the separate extension exception found in the decisions. Third, the holdings in both are fact-bound.

In *Harpel*, the court was content to say what was not "in the ordinary course of business" based solely on the facts before it. There was no evidence in *Harpel* as to who intercepted the call or how it was accomplished. Consequently, the Tenth Circuit rejected the defendant's extension exception argument for essentially two reasons. First, the absence of any evidence showing an authorized use of the extension telephone. The court implicitly held that an unauthorized use of an extension telephone is not done in the ordinary course of business. Second, the surreptitious monitoring of private or personal calls is not done in the ordinary course of business.

■ In *James*, the court found the extension exception applicable based on the limit-

tion, then the Tenth Circuit had "read the extension telephone exception out of the law, because 18 U.S.C. § 2511(2)(d) makes clear that interception is generally not unlawful if one of the parties to the communication has authorized the interpretation." 630 F.2d at 419. The Fifth Circuit said it could agree with the Tenth Circuit if it intended to say "that use of an extension tele-

phone to intercept a phone call by someone who was not authorized to use the phone under any circumstances cannot be used 'in the ordinary course of business.'" *Id.* Judge Clark in *Briggs* concurred noting that he agreed with the Tenth Circuit's holding in *Harpel* that a private or non-business call could not be lawfully intercepted under Title III.

ed facts and arguments that had been presented. There is no mention in the *James* opinion whether the employer monitored employees' personal or private phone calls or whether the employees were even allowed to make personal or private phone calls on the business lines. Presumably, the Tenth Circuit believed only business calls were being monitored as that was the employer's stated purpose for the monitoring. The panel in *James* did refer to the "surreptitious" language in *Harpel,* but considered it relevant only to the manner in which the extension telephone was used.[9] The holding in *Harpel* concerning private calls, coupled with the panel's failure to mention or discuss personal calls in *James,* dissuades this court from believing that the extension exception recognized and applied in *Harpel* and *James* allows an employer to monitor by extension phone an employee's private or personal calls, so long as the employer does not monitor the calls surreptitiously.

■ It is not enough that DCC's policy reasons for monitoring and recording the CSRs' telephone calls are justifiable. *See Watkins,* 704 F.2d at 582. In fact, there is little dispute that DCC had legitimate business reasons for monitoring the CSRs' business calls. The real issue is whether DCC proceeded to intercept the communications in the ordinary course of its business.

■ While DCC obviously has a legitimate business interest in monitoring business calls, it does not pretend to have any similar interest in monitoring the CSRs' personal phone calls. The CSRs were not told that personal calls could not be made or received at their desk, and the supervisors knew that such personal calls occurred. The accepted rule with regard to intercepting personal calls of employees was first enunciated by the Eleventh Circuit in *Watkins:*

> We hold that a personal call may not be intercepted in the ordinary course of business under the exemption in section 2510(5)(a)(i), except to the extent necessary to guard against unauthorized use of

the telephone or to determine whether a call is personal or not. In other words, a personal call may be intercepted in the ordinary course of business to determine its nature but never its contents.

704 F.2d at 583 (footnote omitted); *see United States v. Murdock,* 63 F.3d at 1396–97 ("[T]he indiscriminate recording of both incoming and outgoing calls by Mrs. Murdock does not constitute conduct within the ordinary course of the funeral home business in which she had an interest as a part owner."); *Sanders,* 38 F.3d at 741 (employer lacked justification for extended recording of telephone calls, including personal calls); *Deal,* 980 F.2d at 1158–59 (employer's suspicions of employees did not justify recording twenty-two hours of phone calls without regard to whether calls were related to the employer's business interests).

■ Ms. Plumberg testified that she ended the monitoring of a telephone call whenever she determined that the call was personal. The plaintiffs are unable to controvert this testimony. The defendants' practice in monitoring in person only business calls and intercepting personal calls only to the extent necessary to determine whether the call was personal is a valid one under the extension exception. *See Watkins,* 704 F.2d at 583. Consequently, the court grants summary judgment for the defendants on the claim that the defendants unlawfully monitored in person their telephone calls or disclosed the contents of those conversations.

■ DCC does not offer a legitimate business reason that as a matter of law justifies the indiscriminate recording of all business and personal telephone calls received or made during a particular shift. The defendants say they did not listen to the recorded tapes until the plaintiffs filed this action. This does not matter, for "[t]he recording of a telephone conversation alone constitutes an 'aural ... acquisition' of that conversation." *Sanders,* 38 F.3d at 740 (footnote and citations omitted); *see George v. Carusone,* 849 F.Supp. 159, 163 (D.Conn.1994). In their

---

**9.** In *Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 741 (4th Cir.1994), the court said that the open or covert manner in which the intercepting device was used must be examined in deciding

whether employer used it in the ordinary course of business. "Covert use of a surveillance device must be justified by a valid business purpose." *Id.*

reply memorandum, the defendants represent: "Simply because the call may have been recorded, at one point in time, does not mean that the supervisory personnel would discontinue their practice of not listening to personal calls." (Dk. 179 at 8). There is no evidence cited in support of this naked assertion. The defendants are not entitled to summary judgment on the plaintiffs' claim that they unlawfully intercepted and recorded personal phone calls.

██ The defendants Gibb and Scheidegger say they cannot be held liable under Title III as they were not involved in the contemporaneous interception of any phone conversations. Gibb and Scheidegger deny listening to the tape-recorded conversations before the lawsuit was filed, and even if they had, they maintain liability does not rest upon mere acquisition of the tape-recorded conversations. The plaintiffs point to Gibb's and Scheidegger's roles in ordering and authorizing the purchase of the telephone recording device and in directing others to use the recording system. Under subsections (a) and (b) of § 2511, a person can be liable if he or she "procures" another to intercept or to use a device to intercept a wire communication. Based on the facts as presented, questions of material fact remain as to whether Gibb or Scheidegger procured another to intercept or to use a device to intercept the plaintiffs' wire communications.

**INVASION OF PRIVACY**

In the pretrial order, the plaintiffs allege with respect to these claims the following:

Plaintiffs Ali and Ham claim that the actions of the defendants, and each of them, with respect to the monitoring and recording of their telephone conversations and subsequent disclosure of the same, and that the actions of defendants with respect to John Ham and his termination, recklessly and intentionally intruded upon the plaintiffs' solitude, seclusion and private affairs, placed the plaintiffs in a false light, and offended all ordinary and reasonable standards of conduct so as to have constituted an invasion of privacy.

(Dk. 156 at 7). The plaintiffs' invasion of privacy claims assert three different tort theories: (1) intrusion upon seclusion, (2) publicity given to private life, and (3) publicity placing person in false light. The defendants deny that the monitoring and recording of phone calls at work amount to intrusion. As for the latter two torts, the defendants maintain the plaintiffs are unable to prove that the defendants publicized any information.

██ The Kansas Supreme Court has recognized a cause of action for invasion of privacy and has utilized the four distinct tort theories set forth in the Restatement of Torts (Second) §§ 652B–652E. *Froelich v. Adair*, 213 Kan. 357, 358, 516 P.2d 993 (1973). The three theories relevant here are:

"§ 652B. INTRUSION UPON SECLUSION

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man.

. . . .

§ 652D. PUBLICITY GIVEN TO PRIVATE LIFE

One who gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy.

§ 652E. PUBLICITY PLACING PERSON IN FALSE LIGHT

One who gives to another publicity which places him before the public in a false light of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy."

*Froelich*, 213 Kan. at 358–59, 516 P.2d 993; *see Werner v. Kliewer*, 238 Kan. 289, 293–94, 710 P.2d 1250 (1985); *Finlay v. Finlay*, 18 Kan.App.2d 479, 485–86, 856 P.2d 183, *rev. denied*, 253 Kan. 857 (1993).

*Intrusion upon Seclusion*

██ To prevail on an § 652B action for intrusion upon seclusion, the plaintiff must prove: "First, something in the nature of an intentional interference in the solitude or seclusion of a person's physical being, or

prying into his private affairs or concerns, and second, that the intrusion would be highly offensive to a reasonable person." *Werner*, 238 Kan. at 294, 710 P.2d 1250. The interference must be "a substantial one, of a kind that would be highly offensive to the ordinary reasonable person, as the result of conduct to which the reasonable person would strongly object." *Moore v. R.Z. Sims Chevrolet–Subaru, Inc.*, 241 Kan. 542, Syl. ¶ 2, 738 P.2d 852 (1987). The tort "is based upon the manner in which an individual obtains information." *Werner*, 238 Kan. at 294, 710 P.2d 1250. "While liability for the intrusion does not require publication of a plaintiff's private affairs, it does require that the defendant place himself physically, or by means of his senses, within plaintiff's zone of privacy." *Finlay*, 18 Kan.App.2d at 486–87, 856 P.2d 183. Consequently, it is both the manner of intrusion as well as the nature of the information acquired that must rise to the level of being highly offensive to a reasonable person. *Werner*, 238 Kan. at 295, 710 P.2d 1250. The defendants' motive or malice is not an element, for liability turns upon the defendant's actions as opposed to motives. *Froelich*, 213 Kan. at 360, 516 P.2d 993.

▄▄▄ Other jurisdictions have recognized that the improper interception of employees' phone calls may constitute a tortious invasion of privacy. *See, e.g., Awbrey v. Great Atlantic & Pac. Tea Co., Inc.*, 505 F.Supp. 604, 608–10 (N.D.Ga.1980); *Jackson v. Nationwide Credit, Inc.*, 206 Ga.App. 810, 426 S.E.2d 630 (1992), *cert. denied*, 206 Ga.App. 900 (1993); *Benoit v. Roche*, 657 So.2d 574 (La.Ct.App.1995); *Oliver v. Pacific Northwest Bell Telephone Co.*, 53 Or.App. 604, 632 P.2d 1295, 1298 *rev. denied*, 292 Or. 108, 642 P.2d 310 (Or.1981); *cf. Walker v. Darby*, 706 F.Supp. 1467, 1473–75 (N.D.Ala.1989), *rev'd*, 911 F.2d 1573 (11th Cir.1990) (intercepting oral conversations at work with co-employees.) The plaintiffs cannot reasonably claim any offensive intrusion by the monitoring or recording of their business calls at the work place. Such calls were made for the benefit and in the interest of their employer. The business calls were a large part of the plaintiffs' responsibilities at work, and the defendants were simply monitoring the plaintiffs'

work performance. The plaintiffs do not effectively controvert the defendants' practice of monitoring personal calls only for so long as necessary to determine their personal nature. The court does not believe that a reasonable person would consider such a procedure to be a substantial interference with seclusion or highly offensive.

▄▄▄ On the other hand, a reasonable person could find it highly offensive that an employer records an employee's personal phone calls in the circumstances where the employer did not discourage employees from making personal calls at their desks and did not inform the plaintiff employees that their personal calls would be recorded. In *Jackson*, the appeals court upheld summary judgment where the employer had monitored the employee's work telephone:

> [W]e cannot conclude that it is an unreasonable intrusion into appellants' seclusion, solitude or private affairs for Nationwide to monitor its telephones as it routinely did. All employees were advised that the telephones were for business only and that the telephones would be monitored. Therefore, using a speaker telephone to monitor appellants' telephone calls while at work, in the context of this case, does not constitute an unreasonable intrusion into their private affairs.

426 S.E.2d at 632; *cf. Simmons v. Southwestern Bell Tel. Co.*, 452 F.Supp. 392, 394 (W.D.Okla.1978) (The plaintiff did not have a "reasonable expectation of privacy" in his personal telephone conversations at work when he knew that his telephone conversations could be monitored and were being monitored.), *aff'd*, 611 F.2d 342 (10th Cir. 1979). In the instant case, there is a genuine issue of material fact whether the plaintiffs were aware that their personal calls would be recorded prior to April 9, 1993. Without uncontroverted proof that the plaintiffs knew their personal calls would be recorded before any such calls were actually recorded, the court cannot say as a matter of law that the plaintiffs' actual or subjective expectation of privacy in the personal calls made at the work place was unreasonable under the circumstances. *Cf. Walker*, 911 F.2d at 1578–

79. The employer's asserted interest in recording the phone calls "must be balanced against the degree of intrusion resulting from the employer's methods to obtain the information." *Pulla v. Amoco Oil Co.,* 882 F.Supp. 836, 867 (S.D.Iowa 1994) (balancing the respective rights and interests in an employer/employee relationship), *aff'd in part and rev'd in part on other grounds,* 72 F.3d 648 (8th Cir.1995); *cf. Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 820–21, 529 P.2d 104 (1974) (balancing the respective rights and interests in a debtor/creditor relationship). This is a case where a reasonable jury could find that the defendant employer's asserted interest in recording the telephone calls did not justify recording the plaintiffs' personal calls prior to warning about this risk. The defendants' arguments do not warrant summary judgment on this claim.

While the court finds that the defendants are entitled to summary judgment on the plaintiffs' claim of intrusion upon seclusion from the monitoring in person of their telephone calls, the court denies summary judgment as to the plaintiffs' claim that the recording of their personal calls before April 9, 1993, intruded upon their seclusion.

*Publicity to Private Affairs and Publicity in a False Light*

■■■ An element common to both of these claims for invasion of privacy is that the defendant give publicity to a matter concerning the plaintiff. *See* Restatement (Second) of Torts §§ 652D, 652E (1977). "The standard of publicity, ..., is the same in both" claims. *Moore v. Big Picture Co.,* 828 F.2d 270, 275 n. 7 (5th Cir.1987). Comment a to § 652D explains this element:

a. *Publicity.* The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many per-

sons that the matter must be regarded as substantially certain to become one of public knowledge....

Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

Restatement (Second) of Torts § 652D at 384–85; *see Werner v. Kliewer,* 238 Kan. at 296, 710 P.2d 1250; *Polin v. Dun & Bradstreet, Inc.,* 768 F.2d 1204, 1206 (10th Cir. 1985) (Okla. law).

■■ The plaintiffs are unable to prove such widespread disclosure of private matters as to constitute publicizing. The plaintiffs at pages twenty-nine and thirty of their brief allege various instances of publication, several of which are not supported by any citation to evidence of record. Of the different alleged acts of publication, the one coming closest to "publicizing" concerns statements made and actions taken to portray Ham as a dangerous or threatening former employee. Still, the only persons allegedly made aware of this portrayal were DCC employees and law enforcement officers, both of whom would be groups having a legitimate responsibility and need to know of this information. Most courts have summarily disposed of cases under similar circumstances. *See e.g. Krochalis v. Insurance Co. of North America,* 629 F.Supp. 1360, 1371 (E.D.Pa. 1985); *Davis v. Monsanto Co.,* 627 F.Supp. 418, 421–22 (S.D.W.Va.1986); *Wells v. Thomas,* 569 F.Supp. 426, 437 (E.D.Pa.1983); *Beard v. Akzona,* 517 F.Supp. 128, 132–33 (E.D.Tenn.1981); *cf. Moore,* 828 F.2d at 274–75. "Publication to the community of employees at staff meetings and discussions between defendants and other employees is clearly different from the type of *public* dis-

closure found in cases relied upon by plaintiff." *Wells*, 569 F.Supp. at 437. The plaintiffs do not allege that this information had become common knowledge in the business community or any other public arena. The defendants are entitled to summary judgment on the plaintiffs' claims of publicity to private affairs and publicity in a false light.

## DEFAMATION

In the pretrial order, the plaintiff Ham claims:

> that the actions and conduct of the defendant Douglas Cable, its management personnel, and in particular, Jeff Scheidegger, Patty Shaver and Reavis Gibb, on April 19, 1993, at and after the time of his termination, defamed him. He claims such defamation occurred by their acts in knowingly and intentionally communicating, verbally and by conduct, false information and impressions to Topeka Police Department, Shawnee County Sheriff's Department and non-management employees and co-workers of Douglas Cable without reason to know, that the plaintiff John Ham was dangerous and a threat to the workplace and its employees.

(Dk. 156 at 7–8). The defendants seek summary judgment arguing: (1) that Ham cannot prove defamatory words were spoken to the Topeka Police Department; (2) that Ham cannot prove he sustained any damages as a result of the alleged defamatory words; (3) that any communications to law enforcement officers is qualifiedly privileged.

The tort of defamation includes both libel and slander. *Luttrell v. United Telephone System, Inc.*, 9 Kan.App.2d 620, 683 P.2d 1292 (1984), *aff'd*, 236 Kan. 710, 695 P.2d 1279 (1985). To prevail on his defamation claim, the plaintiff Ham must prove (1) false and defamatory words; (2) communicated to a third person; and (3) which injured the plaintiff's reputation. *Polson v. Davis*, 635 F.Supp. 1130, 1146 (D.Kan.1986), *aff'd*, 895 F.2d 705 (10th Cir.1990); *Luttrell*, 9 Kan.App.2d at 620–21, 683 P.2d 1292. "[D]amage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 6, 649 P.2d 1239 (1982). A corporation may be liable for the defamatory utterances of its agent which are made while acting within the scope of his authority. *Luttrell*, 9 Kan. App.2d at 621, 683 P.2d 1292.

At common law, there were two types of defamation: per se and quod. Defamation per se included statements that impugned someone of criminal conduct or of unfitness for his or her trade or profession. *Polson*, 635 F.Supp. at 1147. Defamation per se "did not require proof of actual damages for a finding of liability," but defamation per quod required proof of damages for liability. *Polson v. Davis*, 895 F.2d 705, 708 (10th Cir.1990). The Kansas Supreme Court in *Gobin*, relying on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), eliminated this distinction: "Damages recoverable for defamation may no longer be presumed; they must be established by proof, no matter what the character of the libel." 232 Kan. at 5, 649 P.2d 1239. Despite more recent Supreme Court rulings limiting *Gertz*, it remains the law in Kansas that a plaintiff may not rest on presumed damages but must allege and prove actual damages in a defamation action. *Polson v. Davis*, 895 F.2d at 708; *Zoeller v. American Family Mut. Ins. Co.*, 17 Kan.App.2d 223, 225–29, 834 P.2d 391, *rev. denied*, 251 Kan. 942 (1992).

The defendant to a defamation claim has a number of affirmative defenses, included among them are truth and privilege. *Turner v. Halliburton Co.*, 240 Kan. 1, 7, 722 P.2d 1106 (1986). Truth is a complete defense. *High v. A.J. Harwi Hardware Co.*, 115 Kan. 400, 405, 223 P. 264 (1924). A privilege may be absolute or qualified. *Turner*, 240 Kan. at 7, 722 P.2d 1106. In this case, the defendants assert a qualified privilege. "Whether a privilege is available in an action for defamation must be determined based on the status of the particular defendant and the content of the alleged defamatory communication." *Id.*

> A qualified or limited privilege is generally restricted to those situations where public policy is deemed to favor the free exchange of information over the individual's interest in his or her good reputation.

One such qualified privilege exists with respect to business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication. (Citations omitted). The question of whether or not a publication is privileged is a question of law to be determined by the court.

240 Kan. at 7–8, 722 P.2d 1106; *see Faber v. Byrle*, 171 Kan. 38, 42–43, 229 P.2d 718 (1951) (communications to a law enforcement officer made for purposes of assisting in the detection of a crime are subject to a qualified privilege).

▮▮▮▮ Where there is a qualified privilege, the plaintiff must prove not only that the statements were false but that the statements were made with actual malice. *Turner*, 240 Kan. at 8, 722 P.2d 1106. In *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920–21, 494 P.2d 1063 (1972), the Supreme Court of Kansas defined actual malice as acting with "actual evil-mindedness or specific intent to inure." The Kansas pattern instructions define actual malice: "Proof of actual malice requires a plaintiff to prove that the (communication) (publication) was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not and that it was made with actual evil-mindedness or specific intent to injure." *Pattern Instructions— Kansas* 2d 14.54 (1995 Supp.). To recover, the plaintiff "must prove actual malice by the defendant and that it defamed the plaintiff." *Id.* The question of the communication being privileged is one of law, but the issue of malice is one of fact. *Castleberry v. Boeing Co.*, 880 F.Supp. 1435, 1443 (D.Kan.1995).

▮▮▮▮ The defendants say Ham cannot prove that defamatory words were spoken to the Topeka Police Department. Ms. Shaver testified that the Topeka Police Department was told that a disgruntled employee by the name of John Ham had left the building and that the police were needed to watch the building and to protect the employees. Other witnesses testified that police officers came and remained until the employees went home that evening. This constitutes both direct and circumstantial evidence that the defendants made statements about Ham to the police department. The defendants' first argument is without merit.

▮▮▮▮ The defendants next contend that Ham has not alleged and is unable to prove any injury to his reputation. Proof of such damages typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered. *See Hartman v. Meredith Corp.*, 638 F.Supp. 1015, 1017 (D.Kan.1986). The plaintiff has testified to a former employee avoiding him after the alleged defamatory statements were made. The plaintiff posits that Gibb upheld his termination based on the defamatory statements made by Scheidegger and that he has been unable to find other employment because of the same. The court finds the evidence sufficient at this juncture to avoid summary judgment.

The defendants alternatively argue the words spoken to the Topeka Police Department were qualifiedly privileged, as they were made out of concern for the safety of management and employees. The current record indicates genuine issues of material fact remain as to whether the defendants communicated with the Topeka Police Department in good faith and whether actual malice exists on the defendants' part. Summary judgment is inappropriate on the plaintiff Ham's defamation claim.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The plaintiffs claim that the defendants' actions caused the plaintiffs' "physical injury and damage sufficient to justify a claim for negligent infliction of emotional distress." (Dk. 156 at 7). The defendants argue the plaintiffs are unable to prove: (1) a "causal nexus" between the defendants' alleged negligent acts and the plaintiffs' alleged physical injuries, and (2) a contemporaneous, physical injury as defined under Kansas law.

▮▮▮▮ Kansas law is well established that a plaintiff may not recover "for emotional distress caused by negligence unless accompanied by or resulting in physical inju-

ry." *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 806, 897 P.2d 123 (1995); *Humes v. Clinton*, 246 Kan. 590, 598, 792 P.2d 1032 (1990). The plaintiff must sustain an actual physical injury that " 'occurs contemporaneously with or shortly after the incident causing the emotional distress.' " *Schweitzer–Reschke v. Avnet, Inc.*, 874 F.Supp. 1187, 1196 (D.Kan.1995) (quoting *Tyrrell v. Boeing Co.*, No. 91–1285–FGT, 1994 WL 114841, at *12 (D.Kan. Mar. 24, 1994)). The reason for the physical injury rule "is to guard against fraudulent or exaggerated claims, *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1534 (D.Kan.1990); it also recognizes that emotional distress is a common experience in life and is usually trivial, *Freeman v. Kansas State Network, Inc.*, 719 F.Supp. 995, 1001 (D.Kan.1989)." *Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 563 (D.Kan.1995). The "[p]hysical injury is considered evidence or substantiation of severe and genuine emotional distress." *Laughinghouse v. Risser*, 786 F.Supp. 920, 929 (D.Kan.1992) (citations omitted).

In the pretrial order, the plaintiffs' only allegations of negligence on the part of the defendants are their failure "to stop, prevent or appropriately investigate the conduct" of Marcia Trickett and their complaints about her. All other allegations against the defendants, i.e., monitoring, recording, terminating, and retaliating, amount to intentional conduct. *See McDonald v. State of Kansas, Dept. of Corrections*, 880 F.Supp. 1416, 1424 (D.Kan.1995); *Garcia–Paz*, 873 F.Supp. at 563.

■ "Case law requires that the physical injuries must *directly* result from the emotional distress allegedly caused by the defendant's negligence, and must appear within a short span of time after the emotional disturbance." *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 279, 662 P.2d 1214 (1983). Recovery is disallowed when the cause is remote and speculative or when the alleged resulting damages are so conjectural and speculative as to undermine any sound basis for measurement. *Id.* at 277, 279, 662 P.2d 1214. While the plaintiffs' opinions on what caused their stress may be a matter within their knowledge, the nexus

between the stress and subsequent physical symptoms does not appear to be a matter on which the plaintiffs are competent to testify or a matter within the common knowledge of the average layman. The plaintiffs submit no medical evidence establishing to a degree of reasonable medical probability that the alleged physical injuries were the result of emotional stress. *See Laughinghouse*, 786 F.Supp. at 929 (medical diagnosis that stress was a major factor in the plaintiff's life-threatening hives). The medical records made at the time of the different hospitalizations show that the plaintiffs and their treating physicians did not attribute the physical symptoms to the stressful conditions allegedly caused by the defendants' alleged negligence. In short, the court finds that the plaintiffs' evidence is not of the kind or quality from which a jury could reasonably find that the plaintiffs' physical injuries were the direct and proximate result of the emotional distress caused by the defendant's negligence.

■ In addition, the court believes the plaintiffs' general complaints of headaches, rapid heartbeat, and hives are insufficient to sustain a claim for negligent infliction of emotional distress. *See Schweitzer–Reschke*, 874 F.Supp. at 1197 (feeling of anxiety, rapid heartbeat, and a sense of collapsing lungs were insufficient); *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1534, 1537 (D.Kan. 1990) ("real-keyed up, nervous, anxious-type feeling, headaches" were insufficient); *Anderson v. Scheffler*, 242 Kan. 857, 860, 752 P.2d 667 (1988) (shock, emotional pain, feelings of guilt, recurring nightmares, and depression were insufficient); *Hopkins v. State*, 237 Kan. 601, 612–13, 702 P.2d 311 (1985) (insomnia, headaches, weight gain, and general physical upset were insufficient). The defendants are entitled to summary judgment on this claim.

## RETALIATORY DISCHARGE

In the pretrial order, the plaintiffs allege for this claim:

The plaintiffs contend that their termination from employment with the defendant Douglas Cable and the actions and conduct of the defendants, as outlined

above, was wrongful, retaliatory and violative of public policy of the State of Kansas and that such conduct, constituted a retaliatory discharge under the Kansas common law. The public policies and/or state and federal statutes implicated by the plaintiffs' discharge include, but are not limited to, the Kansas General Exchange Tariff which precludes surreptitious monitoring and recording of telephone conversations; the Omnibus Crime Control and Safe Streets Act of 1968, as amended; Southwestern Bell published policies and directives; the Kansas criminal statutes with respect to wiretapping, eavesdropping, invasion of privacy and surveillance and the Kansas constitution. With respect to plaintiffs' claim of termination due to complaints re: illegal and improper conduct with respect to accounts and commissions, the plaintiffs cite to the Kansas banking and securities law with respect to the provision of false or inaccurate financial information, and the public policies of the State of Kansas with respect to fraud and theft.

(Dk. 156 at 6). The defendants seek summary judgment on two alternative arguments: the plaintiffs are unable to prove that they were fired in retaliation for reporting improper behavior and the plaintiffs reported or complained of conduct that does not implicate public policy.

 Kansas employment law is grounded on the doctrine of employment-at-will, that is, absent an express or implied contract "between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged." *Morriss v. Coleman Co.*, 241 Kan. 501, 510, 738 P.2d 841 (1987) (citing *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976)). This means an employer may discharge an employee-at-will "for good cause, for no cause, or even for wrong cause" without subjecting itself to legal liability. *Id.* at 508, 738 P.2d 841. The only exceptions to this rule are based on public policy. *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 176, 872 P.2d 252 (1994). Kansas courts have

recognized public policy exceptions in two general areas:

> (1) where an employee is discharged in retaliation for exercising or intending to exercise his or her rights under worker's compensation laws; and (2) where an employee is discharged for good-faith reporting or threatening to report a serious infraction of rules, regulations, or law pertaining to the public health, safety and the general welfare by a coworker or employer ("whistleblowing").

*Aiken v. Business and Industry Health Group, Inc.*, 886 F.Supp. 1565, 1573 (D.Kan. 1995) (citing *Dickens*, 255 Kan. at 176–77, 872 P.2d 252), *aff'd*, 81 F.3d 172 (10th Cir. 1996) (Table).

 An employer rarely admits to a retaliatory intent; therefore, the employee must look to circumstantial evidence in proving the claim. *Marinhagen v. Boster, Inc.*, 17 Kan.App.2d 532, 540, 840 P.2d 534 (1992), *rev. denied*, 252 Kan. 1092 (1993). Because reasonable persons may differ on the inferences critical in determining a person's state of mind, summary judgment is more often the inappropriate way of resolving the issue of an employer's retaliatory intent. *See Koopman v. Water Dist. No. 1 of Johnson County*, 972 F.2d 1160, 1164 (10th Cir.1992). Nevertheless, when the employee fails to come forth with sufficient evidence to raise a genuine issue regarding the employer's intent or an essential element of her retaliatory discharge claim, the district court may properly grant an employer's motion for summary judgment. *See Koopman*, 972 F.2d at 1164.

 The employee can recover only upon proving that the discharge was "based on," "because" of, "motivated by" or "due to" the employer's intent to retaliate. *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146–148, 815 P.2d 72 (1991). The employee need not prove that retaliation was the employer's sole motive or reason for the termination. *Brown*, 249 Kan. at 147, 815 P.2d 72. The employee must prove her claim "by a preponderance of evidence, but the evidence must be clear and convincing in

**1388**

nature." [10] *Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994).

 The federal district courts in Kansas have adapted the burden-shifting approach applied in discrimination cases for use in analyzing state-law retaliatory discharge claims. *Ramirez v. IBP, Inc.,* 913 F.Supp. 1421, 1429 (D.Kan.1995); *Huffman v. Ace Elec. Co., Inc.,* 883 F.Supp. 1469, 1475 (D.Kan.1995); *Lawrence v. IBP, Inc.,* No. 94–2027–EEO, 1995 WL 261144, at *11 n. 2 1995 U.S.Dist. LEXIS 6118, at *29 n. 2 (D.Kan. Apr. 21, 1995); *see, e.g., Rosas v. IBP, Inc.,* 869 F.Supp. 912, 916 (D.Kan.1994); *cf. Ortega,* 255 Kan. at 526, 874 P.2d 1188 (After noting that the plaintiff must prove a causal nexus between the employee's protected activity and the employer's decision to terminate, the Kansas Supreme Court referred to the burden-shifting scheme from *McDonnell Douglas* as the approach it utilizes in discrimination and free speech employment cases). A typical prima facie case of retaliatory discharge includes the following general elements: (1) engaging in protected activity; (2) discharge subsequent to or contemporaneous with protected activity; and (3) a causal connection between the protected activity and the discharge. *See Conner v. Schnuck Markets, Inc.,* 906 F.Supp. 606, 612 (D.Kan.1995).

 Once the plaintiff employee establishes a prima facie case, it becomes the employer's burden to produce a legitimate, nondiscriminatory reason for the discharge. *Huffman,* 883 F.Supp. at 1475. While its reason must be specific and clear, the employer need not litigate the merits of its reason, prove its reason was bona fide, or prove its reason was applied in a nondiscriminatory fashion. *E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992)

(citations omitted). Once the employer produces such a reason, the presumption of retaliatory intent raised by the prima facie case " 'simply drops out of the picture.' " *Ingels,* 42 F.3d at 621 (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The burden of persuasion now falls back to the employee to prove with clear and convincing evidence that the employer acted with a retaliatory intent. *Rosas,* 869 F.Supp. at 916.

 To avoid summary judgment at this point in the analysis, the employee must assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge. *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir. 1994). "If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 798 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995). On the other hand, should the plaintiff come forth with a prima facie case and evidence that the defendant's reasons are pretextual, the case must go to the jury. *Jones v. Unisys Corp.,* 54 F.3d 624, 630 (10th Cir. 1995).

 The plaintiffs allege they were discharged either for reporting the improper and illegal activity of another CSR who was stealing commissions from them and other CSRs and was creating bogus accounts in order to obtain commissions or for complaining to management about the monitoring and recording of telephone calls in the work place without their consent. To maintain their ac-

---

**10.** "Clear and convincing" refers to the quality of proof, not the quantum. *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). For the evidence to be clear and convincing,

the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). The evidence is clear "if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega,* 255 Kan. at 528, 874 P.2d 1188 (*citing Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)).

tion for retaliatory discharge for whistle-blowing, the plaintiffs must carry:

> the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain.

*Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988). "The public policy of protecting employees from retaliatory discharge is to ensure that infractions of rules, regulations or laws pertaining to public health and safety are properly reported." *Moyer v. Allen Freight Lines, Inc.,* 20 Kan.App.2d 203, 206, 885 P.2d 391 (1994) (citation omitted), *rev. granted,* 256 Kan. [Adv.Sheet No. 3, p. XXXIV].

■ Despite the defendants' arguments, the court fails to see the parallel between Ham's and Ali's reports and complaints and the case of *Herman v. Western Financial Corp.,* 254 Kan. 870, 882–83, 869 P.2d 696 (1994). In that case, the plaintiff complained that the savings and loan where she worked had granted a loan when the application did not meet the institution's internal underwriting guidelines. Unlike *Herman,* the plaintiffs here have a factual basis for claiming a good faith belief that Trickett's conduct amounted to theft and fraud and that the employer's interception of the CSRs' telephone calls was a civil and/or criminal violation of Title III. "It has long been recognized as public policy to encourage citizens to report crimes." *Palmer,* 242 Kan. at 899, 752 P.2d 685 (citation omitted). "There is no public policy more basic, nothing more implicit in the concept of ordered liberty ... than the enforcement of a State's criminal code." *Palmateer v. International Harvest-*

er Co., 85 Ill.2d 124, 52 Ill.Dec. 13, 16, 421 N.E.2d 876, 879 (1981). The court has no difficulty finding that the plaintiffs' reported concerns implicate public policy. *See, e.g., Belline v. K–Mart Corp.,* 940 F.2d 184, 187–88 (7th Cir.1991) (Under Illinois law, plaintiff employee protected from retaliation in reporting criminal wrongdoing by co-worker); *Byle v. Anacomp, Inc.,* 854 F.Supp. 738, 744–45 (D.Kan.1994) (plaintiff employee reported co-employee's conduct that not only violated company regulations but constituted criminal theft); *Palmer,* 242 Kan. at 898–99, 752 P.2d 685 (plaintiff employee reported Medicaid fraud by employer); *Moyer,* 20 Kan.App.2d at 206–07, 885 P.2d 391 (plaintiff employee reported equipment failures which were violations of Department of Transportation regulations). In short, a reasonable jury could find the plaintiffs reasonably believed in good faith that Trickett's actions constituted theft and that the employer's interception of telephone calls violated state and/or federal law and that by complaining about Trickett and the interceptions the employer would take some action.

■ Whether the plaintiffs were discharged in retaliation for reporting and complaining about the illegal conduct is a question of fact over which reasonable minds could differ. The plaintiffs present evidence that supervisors had not been critical of their work performance until shortly after they had reported these matters. Ham was discharged within a matter of days after complaining about the recording of telephone calls. Ali was discharged upon returning from a medical leave of absence. Prior to Ali's discharge, Scheidegger threatened to fire her if she mentioned Ham or wiretapping to any technician, customer or CSR. When the plaintiffs were terminated, the defendants told them the reason for their dismissals was economic, but DCC hired other CSRs around the same time or shortly thereafter. In addition, the plaintiffs say that other CSRs were not discharged for poor sales performance. On the record as it presently stands, the court denies the defendants' motion for summary judgment on this claim.

**1390**

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The plaintiffs claim in the pretrial order that the defendants' actions "constituted extreme and outrageous conduct" and that the defendants "intentionally inflicted severe emotional distress upon them." (Dk. 156 at 7). The defendants argue that the plaintiffs' allegations and proof fall short of demonstrating extreme and outrageous conduct.

 Kansas recognizes the tort of intentional infliction of emotional distress or outrage. *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). Liability under this tort arises when a person engages in extreme and outrageous conduct and thereby intentionally or recklessly causes severe emotional distress to the plaintiff. *Id.* To prevail on this claim, the plaintiff must prove:

> (1) The conduct of the defendant must be intentional; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, Syl. ¶ 3, 662 P.2d 1214). Conduct is not extreme and outrageous unless regarded as exceeding the bounds of decency or as utterly intolerable in a civilized society. *Wiehe v. Kukal,* 225 Kan. 478, 482, 592 P.2d 860 (1979). Liability also depends on clearing two threshold determinations by the court that "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and ... [that] the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981).

"The Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims." *Bolden v. PRC Inc.,* 43 F.3d 545, 554 (10th Cir.1994), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). " 'The overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently "outrageous" to support the cause of action.' " *West v. Boeing Co.,* 843 F.Supp. 670, 677 (D.Kan.1994) (quoting *Lindemuth v. Goodyear Tire & Rubber Co.,* 19 Kan.App.2d 95, 100, 864 P.2d 744 (1993)), *vacated in part on other grounds,* 851 F.Supp. 395 (D.Kan.1994). There are but a handful of Kansas cases in which the courts have allowed outrage claims to go to the jury. *See, e.g., Perry v. Saint Francis Hosp. & Medical Center,* 886 F.Supp. 1551, 1560–62 (D.Kan.1995) (It was enough that the nurse had "exploited a position of trust and respect gained from a emotionally vulnerable family" and intentionally misled the grieving family into completing consent forms for the donation of tissue from their loved one's dead body that exceeded their express wishes); *Bernard v. Doskocil Companies, Inc.,* 861 F.Supp. 1006, 1015 (D.Kan.1994) (Incidents of racial slurs, pranks, and the threat of throwing a thinner-soaked rag around the plaintiff's neck while he was welding were enough when considered as a whole); *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990) (Continuous harassment for two years that involved "screaming and cursing," "unwanted touchings and sexual comments," and "fits of rage which included throwing things and tearing up files," because the plaintiff would not sleep with the defendant); *Taiwo v. Vu,* 249 Kan. 585, 593, 822 P.2d 1024 (1991) (the defendant assaulted, battered, falsely imprisoned, falsely accused, induced an employee to falsely accuse, and filed a false police report against the plaintiff); and *Gomez v. Hug,* 7 Kan.App.2d 603, 604–05, 645 P.2d 916 (1982) (the defendant employer over the course of several days verbally accosted the plaintiff employee with vulgar racial slurs, grossly offensive insults, and repeatedly threatened him with physical violence).

 The alleged actions here taken by the defendant are more akin to the kind of "ordinary business decisions ... made every day ... across the nation" as opposed to what a civilized society would call atrocious, indecent and utterly intolerable. *Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. 1499,

1508 (D.Kan.1993), *aff'd,* 51 F.3d 285 (10th Cir.1995) (Table). Deciding on the appropriate discipline for an employee accused of theft, deciding to monitor employees' telephone calls, terminating an employee, and demanding that a terminated employee leave the business premises are just examples of the kind of business actions ordinarily expected from employers. As for any alleged harassment, the plaintiffs' opinion about the character of the defendants' conduct is not enough to create a genuine issue of fact. The plaintiff must come forth with specific facts showing that the conduct occurred with such frequency and was of such a nature as to reach the threshold of extreme and outrageous.

"'[L]iability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities.'" *West v. Boeing Co.,* 843 F.Supp. at 677 (quoting *Roberts,* 230 Kan. at 293, 637 P.2d 1175). Both as a member of the public and as an employee, the plaintiff is necessarily expected to be inured to some "'amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind.'" *Id.* Scheidegger's rough language and his isolated threats of termination are the kind of conduct that a person reasonably can be expected to endure on occasion.

An employer's actions do not become actionable under the tort of outrage simply because they are driven by a retaliatory motive. *See Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. at 1507; *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1262 (D.Kan.1984). "There must be something more, something about the manner in which the retaliation occurred, that makes the conduct actionable...." *Anspach,* 817 F.Supp. at 1508. The defendants' actions, when considered individually or in combination, do not amount to extreme and outrageous conduct. The defendants are entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk.159) is granted as to the plaintiffs' claims of Title III violations based on allegations that the defendants monitored in person the plaintiffs' telephone calls or disclosed the contents of the same, claim of intrusion upon seclusion based on the defendants' monitoring in person the plaintiffs' telephone calls, claims of publicity to private affairs and publicity in a false light, claim of negligent infliction of emotional distress, and claim of intentional infliction of emotional distress, and claim of intentional infliction of emotional distress, and is denied as to all other claims.